**CONNECTICUT IMPORTING CO. v. CONTINENTAL DISTILLING CORPORATION et al.**

No. 235.

Circuit Court of Appeals, Second Circuit.

July 16, 1942.

See, also, 1 F.R.D. 190.

Raymond E. Hackett, of Stamford, Conn. (Mark W. Norman, of Stamford, Conn., Earl Jay Gratz, of Philadelphia, Pa., and Walter B. Lockwood, of Stamford, Conn., of counsel), for defendant-appellant Continental Distilling Corporation.

Abraham S. Weissman and Charles Henchel, both of New Haven, Conn., for defendant-appellant A. Sherman Mfg. Co., Inc.

Arthur Klein and Robert J. Woodruff, both of New Haven, Conn. (David S. Day and Norman K. Parsells, both of Bridgeport, Conn., of counsel), for plaintiff-appellee Connecticut Importing Co.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an action to recover treble damages, brought under Section 7 of the Sherman Anti-Trust Act. 15 U.S.C.A. § 15 note. The violations of the act set forth in the complaint and in plaintiff's proof consisted of a conspiracy between Continental Distilling Corporation and the other defendants named in the complaint, as well as Austin-Nichols and McKesson & Robbins, to control wholesale and retail prices on the liquor products sold by Continental Distilling Corporation through its Connecticut distributors and to boycott and blacklist all retailers and distributors, including the plaintiff, who would not maintain the prices agreed upon.

The defendants denied the existence of the conspiracy and introduced testimony in support of their position, but there was enough evidence to justify the jury in finding that such a conspiracy was formed, that it restrained competition and that it caused damage to the plaintiff. The jury returned a verdict for the plaintiff in the sum of $16,000, upon which judgment was entered for treble the amount. The defendants Continental Distilling Corporation and A. Sherman Manufacturing Company have appealed.

In September, 1936, Continental Distilling Corporation appointed the plaintiff a distributor of its liquor products for the State of Connecticut and informed it that it would remain a distributor as long as it paid its bills. Continental issued price lists containing suggested resale prices from its distributors to retailers and from retailers to the public. During the same month representatives of Austin-Nichols, McKesson & Robbins and the defendant Libbey & R. C. Williams Corporation, which were also distributors of Continental's liquor products for Connecticut, met in New Haven at the Hotel Taft and complained to each other about the appointment of the plaintiff as a distributor, and Libbey of Libbey & R. C. Williams Corporation was said to have then sent a telegram to the sales manager of Continental objecting to the appointment. The plaintiff did not adhere to the Continental price lists in respect to resales of its products, but began price cutting. The various distributors, including the plaintiff, all belonged to a Connecticut trade organization which was committed to price maintenance in the liquor business. In November, 1936, Continental adopted the policy of obtaining agreements from its distributors to maintain its price schedules and of enforcing observance of these agreements. Libbey & R. C. Williams Corporation, A. Sherman Manufacturing Company, Austin-Nichols, McKesson & Robbins and the plaintiff all wrote letters to Continental agreeing to adhere to its schedule of resale prices. But the plaintiff continued price cutting in spite of this, though the other distributors in general carried out their agreements. Grabuski, the sales manager of Continental for Connecticut, vainly protested to Brochin, who was the plaintiff's president, about this price cutting and told him that the other distributors were objecting. The representative of Austin-Nichols testified that, in December, he had accumulated complaints and was then promised by Grabuski that their "trouble would be over soon." Brochin testified that on January 7 or 8, 1937, Grabuski notified him that Continental had held a meeting with all the distributors and that they and Continental had decided to cut off the plaintiff who was no longer to receive Continental merchandise. Grabuski said: "You are cut off because you didn't abide by the policy of our company, and that is the decision made between all of us," and added that Brochin didn't "know how to make profits." When Brochin asked if there was any chance to be reinstated Grabuski told him that there was no chance, that no distributor would buy of Continental if it reinstated the plaintiff and that he was not going to lose five distributors because of Brochin. Brochin then telephoned Robert A. Smith, the vice president and general sales manager of Continental, at Philadelphia, and requested an interview. Smith agreed to see Brochin in New Haven. He

came there on January 18 and told Brochin that he had arranged for a meeting on January 19 because the question of reinstatement was one that he had to decide with all the distributors. The meeting was held on the 19th at the Hotel Taft; representatives of Libbey & R. C. Williams Company, A. Sherman Manufacturing Company and McKesson & Robbins were present, as well as Grabuski and Smith of Continental. Lapides of Austin-Nichols was also at the Taft at that time, though on instructions from his company he did not attend the meeting. He was, however, told the result of it by Grabuski the next day and had talked with Smith about it just after it ended. According to the plaintiff's testimony, Brochin and Rabinowitz, who went to New Haven to obtain reinstatement for the plaintiff, were excluded from the meeting on the motion of the representatives of Libbey and Sherman. After the meeting was concluded Brochin and Rabinowitz were handed their hats by Smith, the plaintiff was not reinstated, and thereafter was never sold any of the Continental brands of liquor. When Smith gave Brochin and Rabinowitz their hats, he remarked: "Well, gentlemen, it was decided that you gentlemen are to be definitely discontinued as our distributors." Defendant's witness, Samuel A. Sherman, the vice-president of A. Sherman Manufacturing Company, testified that the latter's brother Joe had a heated argument with Brochin, just before the meeting was held, and accused Brochin and his salesmen of "secret 'kickbacks' that discredited the whole line with the retailers."

There was proof that in order to carry out the arrangement to fix prices Continental employed so-called "missionary men" to canvass retail stores and to advise such stores as were found to be selling Continental's brands below the list prices to desist and, if they did not desist, to report them to the distributors, blacklist them and prevent them from buying any more goods. Other means Continental adopted to penalize retailers who refused to conform to the price schedule were to buy out their stocks of Continental goods and to induce newspapers not to carry their advertising.

From the membership of all the distributors in a price maintenance trade association, the letters in which each promised to adhere to the price schedules of Continental, the asserted inability of Continental to reinstate plaintiff without the consent of the other distributors, and the meeting of January 19th at which the reinstatement of the plaintiff was refused, it is a reasonable inference: (1) that the defendants agreed at some time in November, 1936, to maintain uniform prices in disposing of Continental's liquors, (2) that when plaintiff was found to be under-cutting and failing to maintain prices, its competitors, Libbey, Sherman, McKesson & Robbins and Austin-Nichols insisted on removing a distributor (to whom in fact they had objected from the beginning) and refused to allow it to be reinstated, and (3) that the defendants entered into a conspiracy to violate the Sherman Act which resulted in the loss to plaintiff of its position as distributor of Continental and deprived it of such profits as it would have realized if it had been allowed to continue its former status.

There can be no doubt that an agreement to fix resale prices restrains competition and violates the Sherman Anti-Trust Act, and that there was substantial proof of a conspiracy by the defendants and other distributors to that end and of acts on their part to carry out the illegal agreement. This rule is well settled by repeated decisions. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 224 note 59, 60 S.Ct. 811, 84 L.Ed. 1129; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 438, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Trenton Potteries Co., 273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; Federal Trade Commission v. Beech-Nut Co., 257 U.S. 441, 452, 453, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882. Such an agreement is illegal irrespective of the reasonableness of the prices. It necessarily restricts freedom of competition and is contrary to the policy of the Sherman Act. We recently upheld a judgment awarding damages to the present plaintiff against different defendants under facts closely resembling those now before us. Connecticut Importing Company v. Frankfort Distilleries, 2 Cir., 101 F.2d 79. The present situation is not one where Continental indicated that it would not sell to plaintiff in the future if the latter did not observe its price schedules, but one where there was proof of an agreement among the defendants to maintain the schedules and of a conspiracy on their part to exclude plaintiff as a distributor because it failed to keep its bar-

gain. Accordingly, the doctrine announced in United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443, does not apply.

Appellants argue that the court erred in allowing the jury to award damages up to the time of the bringing of this action or for so long as the plaintiff remained in business. This criticism is based on the following statement in the charge of Judge Clark, who presided at the trial in the District Court: "If it were proven, and you find it proven, that there was a definite contract for a certain period of time, then the amount of damages might well cover that period. I think that it is only fair to express the comment that it seems to me the general trend of the evidence was not so much to show a definite period of the contract or arrangement, but more one at the will of the parties. This, however, I leave to your recollection and to your finding as to whether there was a definite period or otherwise. If it was not a definite period, then I think you have to consider the amount of damage along the line of a probable expectancy, a kind of expected good will."

■ It is to be observed that no objection was made to the foregoing charge and also that no testimony was offered of damages computed beyond estimated profits which might have been realized up to the date of suit. No objection was made to the admission of these computations as evidence of damages, and the only attack upon them as proof of loss was that plaintiff's scale of earnings, prior to its exclusion as a distributor, did not afford a proper forecast for the value of its expectancy and that in any event its damages should have been limited to the period prior to August 17, 1937, when the Miller-Tydings Act, 15 U.S.C.A. § 1, went into effect and Continental might lawfully have required a price-fixing agreement from its distributors. The wrong the plaintiff suffered occurred when it was excluded as a distributor. Any continuance of the conspiracy beyond that period could have no effect on its right to damages after Continental had once terminated its agency with the joint action of the other defendants.

For the reasons we have already given a conspiracy was proved to fix prices on the resale of Continental's brands in violation of the Sherman Act. Under the Miller-Tydings Act which, on August 17, 1937, amended Section 1 of the Sherman Act, it would have been lawful after that date for Continental to make an agreement with the plaintiff "prescribing minimum prices for the resale" of commodities bearing the brand or name of Continental, if such an agreement was lawful under the Connecticut law; and by the Fair Trade Act adopted at the 1937 Session of the Connecticut Legislature an agreement prescribing minimum prices for resale would have been valid. But the Miller-Tydings Act did not relieve the acts of the defendants from illegality. On the contrary, it specifically provided that in spite of the exemption permitting an agreement between a buyer and seller to fix prices it would still be unlawful for distributors of commodities to conspire together to fix prices. This proviso was to the effect that the preceding exemption of contracts, prescribing minimum prices for resale, from the incidence of the Sherman Act did not make lawful any agreement "for the establishment or maintenance of minimum resale prices * * * between manufacturers, or between producers, or between wholesalers * * * or between retailers, or between persons, firms, or corporations in competition with each other." In other words the violation of law would not be in the agreement of Continental to fix resale prices, but in the combination of the distributors with one another and with Continental to effect this result.

■■ The defendants tortiously caused the plaintiff to lose its right to act as a distributor of Continental. If it had been allowed to continue in that relation it could, after August 17, 1937, have been prevented by Continental from price-cutting. It is quite problematical what effect such prevention would have had upon its net earnings. The question of whether it would have affected its prior scale of profits was left by Judge Clark to the jury. That was the most favorable action the defendants could ask for. Perhaps, as Grabuski said, cessation of price-cutting would have resulted in better earnings. The verdict for less than the amount of earnings estimated on the former scale probably indicated that the jury thought higher prices would have resulted in less profits and also they may have regarded a scale of anticipated earnings based on those of the autumn of 1936 as subject to some discount. Prior to plaintiff's exclusion as a distributor, it had made money from buying and selling the

Continental brands. The defendants were wrongdoers and, it seems to us, had the burden of proving that the plaintiff whom they had driven out of business would not have realized the profits it once enjoyed if it had had to charge higher prices to its customers.

We have examined the various criticisms by the defendants of the charge and refusals to charge and think them of little moment. The only points of any importance that we have not disposed of in our previous discussion are (1) the instruction to the jury that it might find that the conspiracy had its inception at the meeting of January 19, 1937, and (2) the admission of Brochin's testimony that two nationally known distributors had discontinued the plaintiff as a distributor in January, 1937.

While the meeting of the representatives of Continental and the defendant distributors that resulted in barring plaintiff's reinstatement was most important as indicating that they had wrongfully cooperated in discharging it as a distributor, it also showed a joint action on the part of the defendants aimed at preventing its continuance as a distributor and furnished proof of an additional invasion of plaintiff's rights.

Brochin's testimony as to the discontinuance of the plaintiff as a distributor by two distillers other than Continental was clearly admissible in reply to matter brought out on his previous cross-examination.

We find no error in the conduct of the trial and accordingly the judgment is affirmed.