RING v. SPINA et al.
No. 230.

Circuit Court of Appeals, Second Circuit.
March 19, 1945.

Rehearing Denied April 19, 1945.

Carl E. Ring, of New York City (Ring & Murray, of New York City, on the brief), for plaintiff-appellant.

Philip Wittenberg, of New York City (Wittenberg, Carrington & Farnsworth, of New York City, on the brief), for defendants-appellees Spina, Heyman, Hannan, and Pauker.

Jonas J. Shapiro, of New York City (Greenbaum, Wolff & Ernst, Sidney R. Fleisher, and Monroe R. Lazere, all of New York City, on the brief), for defendant-appellee The Authors' League of America, Inc., sued herein as The Dramatists'

Guild of the Authors' League of America, Inc.

Before EVANS and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is an appeal from an order of the District Court vacating a temporary injunction and denying a motion for such injunction pending trial in an action for treble damages under the Sherman Act, as amended, 15 U.S.C.A. § 15, and for other relief. Defendants Spina, Heyman, and Hannan are authors of a theatrical production called "Stovepipe Hat." The other defendants are Pauker, agent of these authors, and The Dramatists' Guild of the Authors' League of America, Inc., an association said to include substantially all the playwrights in the country. Restraint of trade is alleged to be accomplished by means of the Guild's Minimum Basic Agreement, which a producer or "manager" must sign before any Guild members, such as the authors herein, may license or sell to him their works. The Basic Agreement, among other things, fixes the minimum terms under which the Guild permits any of its members to lease or license a play, including the minimum advance payments and the minimum royalties to be paid by a manager. It limits contracts by both managers and authors to those made under its own terms, and between managers and members, both of whom are "in good standing" with the Guild.[1] It also provides that any dispute shall be finally adjudicated by arbitration.

It appears from the moving papers that plaintiff signed this Minimum Basic Agreement after he had invested $50,000 in the play. He came into the venture first by association with, later by taking over the rights of, one Gaumont, who had entered into a "Production Contract" with the three authors on February 7, 1944, whereby Gaumont was to produce the play upon stated royalties and other payments—all subject to the provisions of the Basic Agreement. Then plaintiff on May 4, 1944, to safeguard his investment, and upon his agreement to advance the balance necessary for the show to open in New Haven, May 18, 1944, attempted to enter into an agreement with the authors on the basis of Gaumont's contract with them; but they signed only on condition that their lawyer would later approve. Their lawyer held, however, that this contract could not be made with plaintiff, a non-Guild member; and it was destroyed. Thereupon plaintiff, as he says, "against his will and under the coercive pressure of the monopolistic practice and rules and regulations" of the Guild, signed its Basic Agreement, in order that he might protect his part in the venture. The play did open in New Haven, and then went on to Boston, preparatory to going to Philadelphia and then to New York City; and plaintiff put up an additional $75,000, as he alleges. A dispute having arisen as to changes which plaintiff thought should be made in the play, the authors then took the position that plaintiff had breached the Basic Agreement by making changes without consent of the authors, contrary to its provisions, and hence that the production contract was terminated. The play was then forced to close and the authors requested arbitration of the dispute pursuant to the arbitration clauses of the Basic Agreement. Thereupon plaintiff commenced this action and asked for a temporary injunction, which was first granted pending a further hearing, but later denied after the hearing had been held.

The motion for a temporary injunction pending trial asked that defendants be enjoined from proceeding with arbitration or otherwise enforcing the Basic Agreement and from interfering with plaintiff's production of the show, and that royalties be withheld pending assessment of damages in this action. In denying the motion the District Court stated that not enough facts had been furnished to indicate that the

---

[1] Thus Art. 1, Sec. 2, "Member's Right to Contract," provides: "None of the members of the Guild shall, without its consent, make any contract granting rights to produce and present a play upon the speaking stage in the United States except under the terms of this Basic Agreement and only with a Manager who is in good standing with the Guild. The names of Managers in good standing shall be filed with the Secretary of the Guild, and any Manager or Member of the Guild shall be entitled, upon written demand, to be informed of the names of Managers in good standing. The Guild shall have the right to notify its Members and Managers as and when any Manager has ceased to be in good standing." Like restrictions govern the "Manager's Right to Contract" under Art. 1, Sec. 1.

Basic Agreement was void under the Sherman Act, that the transactions here involved were not in interstate commerce, and that relief should be denied, since the parties were in pari delicto and since plaintiff was seeking at the same time to be awarded rescission and enforcement of a contract.

■ The granting or denial of an interlocutory injunction is usually relegated to the discretion of the District Court, which an appellate tribunal is reluctant to disturb. State of Alabama v. United States, 279 U.S. 229, 230, 231, 49 S.Ct. 266, 73 L. Ed. 675. But here the trial court's denial of the injunction was based in substantial measure upon conclusions of law which can and should be reviewed because of their basic nature in this litigation. Cf. Bowles v. Nu Way Laundry Co., 10 Cir., 144 F.2d 741; Bowles v. May Hardwood Co., 6 Cir., 140 F.2d 914; Coty, Inc. v. Leo Blume, Inc., 2 Cir., 24 F.2d 924; Schey v. Turi, 2 Cir., 294 F. 679. The case then should be remanded for action by the District Court in the light of the legal principles thus enunciated.

■■ Plaintiff attacks the Basic Agreement for its provisions for compulsory arbitration, for price fixing, and for dealing with only Guild members. It is now well settled that a contract covering a large part of an industry will be void and illegal under the Sherman Act for such restrictive agreements and that these constitute adequate proof of a combination in restraint of trade. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; Ethyl Gasoline Corp. v. United States. 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 720, 64 S.Ct. 805, 88 L.Ed. 1024; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Univis Lens Co., 316 U.S. 241, 250, 251, 62 S.Ct. 1088, 86 L.Ed. 1408; United States v. Masonite Corp., 316 U.S. 265, 274, 62 S.Ct. 1070, 86 L.Ed. 1461; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; Fox Film Corp. v. Muller, 296 U.S. 207, 56 S.Ct. 183, 80 L.Ed. 158; Youngclaus v. Omaha Film Board of Trade, D.C. Neb., 60 F.2d 538, 540. The agreement also forbids outright sale of radio, television, and other subsidiary rights in the play prior to its stage presentation; and even thereafter such sales still require the Guild's written approval. These and similar provisions in the Basic Agreement indicate an attempt to control the industry; and the affidavit of Richard Rodgers, president of the Guild, tends to admit that such is the purpose of the organization. We think we must hold that there is a showing prima facie of an agreement in restraint of trade. We need not go further at this time before a trial has established the extent of the restraint, except perhaps to suggest that, in view of the repeated statement by the Supreme Court that a "price-fixing combination" is "illegal per se under the Sherman Act" (cf. 316 U.S. 274, 62 S.Ct. 1076, 86 L.Ed. 1461; United States v. Bausch & Lomb Optical Co., 321 U.S. 720, 64 S.Ct. 805, 88 L.Ed. 1024), it is difficult for us to see now how this Basic Agreement can be upheld, at least in its entirety.

The District Court, however, stressed the point that there can be no recovery under the Sherman Act where the restraint fails to involve transactions in interstate commerce. But we disagree with the conclusion below that the restraint in question was not of commerce among the several states. The District Court relied particularly upon the cases of Hart v. B. F. Keith Vaudeville Exchange, 2 Cir., 12 F.2d 341, certiorari denied 273 U.S. 703, 704, 47 S.Ct. 97, 71 L.Ed. 849, and Federal Base Ball Club of Baltimore v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357. These cases held that contracts for the personal services for exhibition purposes of vaudeville and baseball artists were not in interstate trade or commerce, even though the actual exhibitions were to take place in different states.

■ Even if we thought that this present case concerned only a musical play being prepared in the provinces for Broadway, we should doubt the presently controlling force of these precedents. Employment contracts for separate exhibitions seem to us quite different from the substantial business of readying a musical comedy through tryouts on the road for New York production. There must be the securing of services of countless actors, actresses, members of choruses, and others, of scenery, music, and appropriate lighting, then the strenuous activities required to weld all these parts into a delectable whole, the judicious advertising, and all the other details to such a production, so extensive in fact that it seems not unusual for a single play to be

separately incorporated as a business corporation. And the road tryouts—here, from New Haven to Boston to Philadelphia—are an essential part of the fashioning of a perfect product for the Broadway trade. Moreover, there is no doubt of the steadily expanding content of the phrase "interstate commerce" in recent years; and hence there is no longer occasion for applying these earlier cases beyond their exact facts.[2] The Supreme Court has not hesitated to regard the distribution of motion picture films as interstate commerce, Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; United States v. First Nat. Pictures, 282 U.S. 44, 51 S.Ct. 42, 75 L.Ed. 145; Binderup v. Pathé Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; and it may seem invidious to draw a different conclusion as to a stage production. Cf. Note, 35 Col.L.Rev. 1072, 1090; Charles A. Ramsay Co. v. Associated Bill Posters of U. S. and Canada, 260 U.S. 501, 43 S.Ct. 167, 67 L.Ed. 368; C. E. Stevens Co. v. Foster & Kleiser Co., 311 U.S. 255, 61 S.Ct. 210, 85 L.Ed. 173; Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Southeastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440; United States v. Frankfort Distilleries, Inc., 65 S.Ct. 661.

But much more is here involved than merely an agreement for the production of a single play; under attack is a broad plan for controlling the dramatic productions of the country. It is clear that the plaintiff in an anti-trust suit need not himself be in interstate commerce. It is sufficient that the combination which is the cause of his injury seeks to restrain such commerce. Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241; United Copper Securities Co. v. Amalgamated Copper Co., 2 Cir., 232 F. 574. Here the purpose of the Basic Agreement seems not at all in doubt; it is in effect admitted by the Guild's president in his affidavit, although he calls it a "minimum collective bargaining agreement" "to produce a fair return for the labor of its members who write

plays for a living." But the cases cited earlier show that a price-fixing combination is not saved by the high purpose for which it is conceived. Cf. also Fashion Originators' Guild of America v. F. T. C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. So far as the moving papers go, they thus show that this is in fact a system of control of theatrical productions wherever produced or transported throughout the country and even in foreign lands. That it also encompasses local incidents does not deprive it of its interstate character. United States v. Southeastern Underwriters Ass'n, supra, 322 U.S. 533, 547, 64 S.Ct. 1162, 88 L.Ed. 1162; Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 274–277, 55 S.Ct. 182, 79 L.Ed. 356; Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 35, 43 S.Ct. 470, 67 L.Ed. 839; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; United States v. Patten 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; Note, 35 Col.L.Rev. 1072, 1088.

The Guild contends, however, that it is a labor union, and thus attempts to bring itself within the exception of § 17 of the Sherman Act, as amended, 15 U.S.C.A. § 17. It is true that this exception has recently received a broad interpretation in the light of its original purpose. United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; United States v. Building & Construction Trades Council of New Orleans, La., 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508; United States v. International Hod Carriers', etc., Council, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508; United States v. American Federation of Musicians, 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120; Allen Bradley Co. v. Local Union No. 3, 2 Cir., 145 F.2d 215, now before the Supreme Court, 65 S.Ct. 433. But as we pointed out in the last case cited, 145 F.2d 215, 223, while the parties to the dispute may not always be employers and employees, yet the exception will not apply unless an employer-employee relationship is "the matrix of the controversy." Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 522, 86

---

2 This appears to be conceded by a vigorous critic of the more recent developments. Powell, Insurance as Commerce in Constitution and Statute, 57 Harv.L. Rev. 937, 961.

L.Ed. 750; American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 44, 87 L.Ed. 497. Here not only are the disputing parties not in an employer-employee relationship, but, unlike the Allen Bradley case, the controversy cannot concern itself with conditions of employment, since none of the parties affected are in any true sense employees. An author writing a book or play is usually not then even in any contractual relation with his producer. If and when he does contract, he does not continue in the producer's service to any appreciable or continuous extent thereafter. Normally the author appears more nearly like the fishermen entrepreneurs of the Hinton case or the doctors in the American Medical Association case than workmen banded together in a union. The minimum price and royalties provided by the Basic Agreement, unlike minimum wages in a collective bargaining agreement, are not remuneration for continued services, but are the terms at which a finished product or certain rights therein may be sold. And no wages or working conditions of any group of employees are directly dependent on these terms. We think the exception therefore inapplicable.

Plaintiff also calls attention to the fact that the parties herein are citizens of different states, and hence he claims also the right to recover under state laws prohibiting combinations in restraint of trade, such as N. Y. General Business Law, Consol. Laws N.Y., c. 29, § 340. In view of the conclusion we have reached as to the applicability of federal law, we find it unnecessary to consider this further claim at this time.

■ The District Court was also of the view that plaintiff's participation in any possible combination, as evidenced by his signing of the Basic Agreement, was sufficient to require denial of relief. As appears above, plaintiff, having invested $50,000 with Gaumont, took over the latter's production contract with the authors and, before he invested more, endeavored to enter into a direct contract with them. But he found this impossible until he in turn became a member of the Guild in good standing by signing the Basic Agreement. The rules of the Guild permitted no other course. Thus, he had to sign to save his $50,000 investment and to safeguard his further attempts to bring the venture to fruition. This seems to us a prima facie showing of economic coercion. We do not think it an answer to say that he knew of this Basic Agreement at the time he dealt with Gaumont. It seems a fair conclusion that the real compulsion for his quite personal commitment came when he found himself actively engaged in plans to take over the venture personally.

■ It is well settled that where one party to an illegal contract acts under the duress of another the parties are not in pari delicto. 6 Williston on Contracts, Rev. Ed.1938, § 1789, and cases cited 5 Williston on Contracts, § 1614, nn. 4–7; 2 Pomeroy, Equity Jurisprudence, 4th Ed., §§ 941, 942. And in actions for triple damages under the Sherman Act a showing of economic duress similar to that asserted here has been held sufficient proof that the plaintiff is not a party to the monopoly. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Charles A. Ramsay Co. v. Associated Bill Posters of U. S. and Canada, supra, 260 U.S. 501, 512, 43 S.Ct. 167, 67 L.Ed. 368; William H. Rankin Co. v. Associated Bill Posters of U. S. and Canada, 2 Cir., 42 F.2d 152, 155, certiorari denied Associated Bill Posters of U. S. and Canada v. William H. Rankin Co., 282 U.S. 864, 51 S.Ct. 37, 75 L.Ed. 765; Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., 2 Cir., 166 F. 254, 261. Further, there appears a definite tendency to hold those not actively engaged in promoting monopoly to be victims, rather than participants in anti-trust violations. Thus, it is well settled that dealers and solicitors for a combination may sue as soon as they are dismissed and claim damages for such dismissal. Victor Talking Mach. Co. v. Kemeny, 3 Cir., 271 F. 810; Straus v. Victor Talking Mach. Co., 2 Cir., 297 F. 791; Connecticut Importing Co. v. Frankfort Distilleries, 2 Cir., 101 F.2d 79; Connecticut Importing Co. v. Continental Distilling Corp., 2 Cir., 129 F.2d 651, certiorari denied Continental Distilling Corp. v. Connecticut Importing Co., 317 U.S. 664, 63 S.Ct. 65, 87 L.Ed. 533. As Judge Chase said in Connecticut Importing Co. v. Frankfort Distilleries, supra, 101 F.2d 79, 81, "This is not a suit in equity where the clean hands doctrine is applicable but merely a suit on a special statute which takes no account of the conduct of the plaintiff prior to the time the cause of action arose." This idea was carried further in Johnson v. Joseph Schlitz Brewing Co., D.C.E.D. Tenn., 33 F.Supp. 176, 179—affirmed on

opinion below, Jos. Schlitz Brewing Co. v. Johnson, 6 Cir., 123 F.2d 1016—to hold that an alleged illegal agreement between plaintiff and defendant "cannot be used to defeat plaintiff's right of action based upon the overriding statutory policy of the Sherman Act, if that right of recovery is otherwise clear." See also National Supply Co. v. Hillman, D.C.W.D.Pa., 57 F. Supp. 4, 7, and Hartford-Empire Co. v. Glenshaw Glass Co., D.C.W.D.Pa., 47 F. Supp. 711, 717, distinguishing between "a victim, rather than a participant in the alleged conspiracy." Finally, it has now been definitely ruled that a licensee under a patent-licensing agreement was not thereby estopped from claiming a violation of the Sherman Act, Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 177, 63 S.Ct. 172, 87 L.Ed. 165, even though he had made a definite agreement to the contrary. American Cutting Alloys v. General Electric Co., 2 Cir., 135 F.2d 502; Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781.

■ Where the parties stand actually and truly in pari delicto, the law should leave them where it finds them. Northwestern Oil Co. v. Socony-Vacuum Oil Co., 7 Cir., 138 F.2d 967, 971, certiorari denied 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081. But here even without a showing of economic coercion as the final step in forcing him to sign the Basic Agreement, plaintiff is precisely the type of individual whom the Sherman Act seeks to protect from combinations fashioned by others and offered to such individual as the only feasible method by which he may do business. Considerations of public policy demand court intervention in behalf of such a person, even if technically he could be considered in pari delicto. Indeed, this is a general principle applicable beyond the anti-trust field. Thomas v. City of Richmond, 79 U.S. 349, 12 Wall. 349, 20 L.Ed. 453; City of Parkersburg v. Brown, 106 U.S. 487, 503, 1 S.Ct. 442, 27 L.Ed. 238; Logan County Nat. Bank v. Townsend, 139 U.S. 67, 11 S.Ct. 496, 35 L.Ed. 107; In re Builders' Finance Ass'n, D.C.S.D.Cal., 26 F.2d 123. Any other conclusion would mean that for many, perhaps most, victims of restraint of trade, private remedies under the Sherman Act would be illusory, if not quite non-existent.

■ Finally, we disagree with the District Court's comment that plaintiff's action fails because he seeks at the same time rescission and enforcement of a contract. This comment is in point only as to a very small part of plaintiff's extensive prayers for relief, which were based upon an extremely detailed, if not verbose, complaint.[3] But plaintiff is entitled to state his claims in detail if he chooses, and rely upon the court to award him such judgment as his case deserves; and at trial he will not be bound by his prayers. F.R.C.P. 54(c), 28 U.S.C.A. following section 723c; Truth Seeker Co. v. Durning, 2 Cir., 147 F. 2d 54; United States, for Use of Susi Cont. Co. v. Zara Cont. Co., 2 Cir., 146 F.2d 606. Since these prayers are not binding at this time, no extensive discussion of the point is called for now. As a matter of fact, it is not improbable that any question as to immediate production of the play by any one, and particularly by plaintiff, a lawyer not a producer, is academic. But should the point ever become important, the trial court may find it possible to separate the rights and duties under the specific production contract assigned to plaintiff from the more far-reaching provisions of the Basic Agreement incorporated therein by a general reference. More broadly still, plaintiff's situation is that of one seeking recovery of a loss due to having been forced to buy goods at a price artificially raised by an illegal combination. It is a main purpose of the Sherman Act to prohibit such a consequence, cf. United States v. Bausch & Lomb Optical Co., supra; United States v. Univis Lens Co., supra; and redress should not be limited to the activities of public officials. As we have seen, this is a statutory private right of action, cf. Connecticut Importing Co. v. Frankfort Distilleries, supra, and hence is not based upon rescission of the contract; even if a technical analysis should show a result substantially equivalent thereto, yet mere legal theory cannot defeat appropriate remedies granted by law. 6 Williston on Contracts, Rev.Ed. 1938, 5081. Of course, plaintiff may not recover three times the amount of his loss

---

[3] Defendants assert that the complaint is insufficient in law. Technically that point is not directly before us; for immediate purposes we say that we think enough is alleged to support the present proceedings. Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972.

654

up to the present time and then keep all profits if he ever should produce the play. But this limitation goes merely to the amount of his potential recovery and fails to indicate that he cannot recover at all.

 So far, therefore, as the underlying principles of law are concerned, we think plaintiff showed prima facie grounds of potential recovery. The District Court did not, however, pass upon the facts in controversy.[4] It is true that much of the story herein is shown by documentary evidence, though the amount actually invested by plaintiff and the proximate cause for the failure of the production seem in serious dispute. Nothing we have said should be considered to foreclose adjudication of these issues, although the parties and the court may be disposed in the interest of expeditious dispatch of this litigation to agree to try the case upon the merits at the same time further hearing is held upon the proceedings for a temporary injunction. Meanwhile we think the ends of justice will be served by continuing the present restraining order—granted by this court to the same effect as the original preliminary injunction below—until hearing and decision upon the facts are had by the District Court. The order as entered was much less broad than that moved for by plaintiff; its main effect is to suspend arbitration proceedings pending adjudication of the validity of the contracts. No good purpose will be served by forcing the parties to the time and expense of arbitration while this question remains unsettled; and serious legal problems may develop if an arbitration is had, and thereafter the contracts are held invalid. Cf. Mohawk Mfg. Co. v. Cavicchi, 281 N.Y. 629, 22 N.E.2d 179, appeal dismissed 308 U.S. 522, 60 S.Ct. 294, 84 L.Ed. 442; Bryson v. Higdon, 222 N.C. 17, 21 S.E.2d 836; Mutual Benefit Health & Accident Ass'n v. United Casualty Co., 1 Cir., 142 F.2d 390, certiorari denied 65 S.Ct. 65.

Judgment reversed and cause remanded for proceedings consistent with this opinion.

PER CURIAM.

Petitions for rehearing denied. These petitions are framed on the theory that the court was making binding adjudications of fact and law, whereas the opinion stated that the court was making merely preliminary rulings to dispose of the particular appeal and pointed out that final rulings both of fact and law must await a definitive hearing in the District Court.

---

[4] The District Court suggested that because of the "square dispute" between the parties as to the relevant facts, it could not make the findings required by F.R. 65(b). That rule refers, however, only to a "temporary restraining order," not to a preliminary injunction, F.R. 65(a).