SERVICE MERCHANDISE COMPANY, INC., Plaintiff, Appellee,

v.

The BOYD CORPORATION, Defendant, Appellant.

SERVICE MERCHANDISE COMPANY, INC., Plaintiff, Appellant,

v.

The BOYD CORPORATION, Defendant, Appellee.

Nos. 83–1096, 83–1097.

United States Court of Appeals, First Circuit.

Argued Aug. 3, 1983.

Decided Dec. 12, 1983.

James D. St. Clair, Boston, Mass., with whom Richard J. Innis, and Hale & Dorr, Boston, Mass., were on brief, for The Boyd Corp.

George S. Isaacson, Lewiston, Maine, with whom Robert B. Gregory, Alfred C. Frawley and Brann & Isaacson, Lewiston, Maine, were on brief, for Service Merchandise Company, Inc.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ–GIMENEZ,* District Judge.

BOWNES, Circuit Judge.

This antitrust action was brought originally by Supermarkets General Corporation (SGC) against The Boyd Corporation (Boyd). SGC alleged that Boyd had violated section 1 of the Sherman Act, 15 U.S.C. § 1[1] and sought treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15.[2] Specifically, SGC claimed that Boyd

---

* Of the District of Puerto Rico, sitting by designation.

1. 15 U.S.C. § 1 provides in pertinent part:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal[.]

2. 15 U.S.C. § 15 provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

had conspired with three other distributors of microwave ovens manufactured by Amana Refrigeration, Inc. (Amana) to allocate among themselves market territories for the sale of Amana microwave ovens and to refuse to sell Amana microwave ovens to The Value House, a division of SGC.

Following the initiation of the lawsuit, Service Merchandise Company, Inc. (SMC) purchased certain assets of SGC, including this antitrust action; SMC was duly substituted for SGC as plaintiff.

During the trial, which took place in November 1982, the district court ruled that the plaintiff's damages would be limited to those incurred by it between the date of the alleged conspiracy, November 1977, and January 1, 1978, when Amana limited sales by a distributor to its own territory. Plaintiff appeals this ruling.

Defendant appeals the jury verdict finding it liable and also the refusal of the district court to grant its motions for directed verdict, judgment n.o.v., and new trial. It also claims that the jury instructions were erroneous in content and because of the omission of certain requested instructions.

## I. LIABILITY

*The Evidence*

 Our review of the evidence and the inferences to be drawn therefrom must be made in the light most favorable to the plaintiff-appellee, SMC. *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 199–200 (1st Cir.1980).

At the time this action commenced, Boyd was an authorized distributor of Amana microwave ovens. Its distributorship area comprised the states of Maine, Rhode Island, New Hampshire, and various counties in Massachusetts and Connecticut. Along with other Amana distributors, Boyd participated in a panoply of product service, public relations and customer education programs sponsored by Amana aimed at increasing both the acceptance of microwave ovens by the public and Amana's share of the market.

SGC (original plaintiff) conducted its retail operations through a chain of "catalog showrooms" called The Value House. These stores were located in Maine, New Hampshire, Vermont, Massachusetts, Connecticut, New York, and New Jersey. Thus, while SGC's market area included that of Boyd, it extended beyond Boyd's distributorship territory. Value House's marketing was built around its catalog. It distributed throughout its sales territory between 600,000 and 700,000 annual fall catalogs and a similar number of spring supplements advertising the products it sold.

Early in 1977, Value House became interested in selling Amana microwave ovens, which it considered a "hot" high profit item. It contacted Boyd. There were phone calls and meetings between Donald Ouellette, vice-president for merchandising of Value House, and William Hanna, sales representative of Boyd. Value House's method of retailing was explained and Hanna was told that Value House had twenty-one stores and a potential for opening more, so that thousands of ovens would be needed. Hanna said there would be no problem, that Boyd had between 500 and 600 units in its warehouse. An agreement was reached on pricing and terms in March of 1977 whereby Boyd agreed to supply Value House with Amana microwave ovens. From March through August of 1977, Value House purchased 300 ovens from Boyd.

On November 2, 1977, the general manager of Boyd, Jerome Cristaldi, met with Ouellette of Value House and told him that Boyd would no longer sell Amana microwave ovens to Value House. The reason given was that Amana distributors in New York and New Jersey were upset because ovens sold by Boyd to Value House were being sold in Value House stores located in New York and New Jersey. Ouellette remonstrated that an agreement had been made with Boyd through Hanna whereby Amana microwave ovens would be put in all of Value House's stores for sale and they were already listed in the fall catalog. Cristaldi remained adamant. On November 9, 1977, James Boyd, president of Boyd,

wrote Value House reiterating the refusal-to-sell decision and stating:

> Mr. Cristaldi made it clear when we accepted your prior orders for this product that we did not wish this merchandise distributed to Value house locations which were located beyond our distributing territory.
>
> Your people agreed to honor this request. I have discovered that, apparently, little or no attention was paid to the request. I have received calls from friends of ours who are Amana distributors in the New York—New Jersey area indicating that merchandise purchased from our company has appeared in stores in their area of sales and service responsibility.
>
> This is a serious problem in our business and we have consistently refused to contribute to the problem. We do not need the business badly enough to disturb good friends of ours in other markets and create service and other after-sales problems for these fellow distributors.

On the same day that Ouellette was informed by Cristaldi that Boyd would no longer sell ovens to Value House, he ordered 100 ovens from Plymouth Electric, an Amana distributor in Connecticut. The order stated, "Please rush, all above ordered goods to be sold in the area." Plymouth Electric sold Value House twenty-eight ovens, which were delivered directly to a Value House store in West Hartford, Connecticut. The price for each oven was twenty dollars higher than the price originally quoted by Plymouth Electric. When Ouellette asked Plymouth Electric to fill the balance of the order, he was told that there was no more product available for Value House.

After the rejection by Plymouth Electric, Ouellette turned again to Boyd. He called Cristaldi on December 12, 1977, and asked if he would ship units for customers within Boyd's trading area that had already ordered them from the catalog. Cristaldi said he would, but only on the condition that Ouellette give him the name and address of every customer so that the ovens could be shipped direct. Ouellette refused to do this, but on December 16 sent Boyd a purchase order for fifty ovens. The purchase order

was returned; no ovens were sold to Value House.

Value House next tried to obtain Amana ovens from a New York distributor, Amana Refrigeration New York. Ouellette was told by the New York distributor that it had no product to sell. A New Jersey distributor, Cooper Distributing, made essentially the same response when it was asked to sell Amana microwave ovens to Value House. Cooper had complained to Boyd at the end of October 1977 that Amana ovens sold by Boyd were showing up in Value House stores in New Jersey.

A few Amana ovens were obtained from a New York diverter, a company that buys merchandise from wherever it can get it and then diverts (sells) it to whoever needs it. When the New York diverter was contacted a second time, Value House was told that "the pipeline had been shut down."

## The Law

Boyd first contends that the evidence was insufficient as a matter of law to establish a conspiracy under section 1 of the Sherman Act. The requisites for proof of an antitrust conspiracy have been stated as follows:

> The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words. *United States v. Schrader's Son*, 252 U.S. 85 [40 S.Ct. 251, 64 L.Ed. 471]. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified. Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.

*American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1139, 90 L.Ed.2d 1575 (1946).

We think the evidence and the reasonable inferences to be drawn from it were sufficient for a finding of conspiracy. Boyd

at first agreed to sell Amana ovens to Value House knowing not only that it had stores outside of Boyd's marketing area, but that Value House was planning to expand. Boyd stopped selling to Value House after distributors in New York and New Jersey had complained that Amana ovens were being sold in Value House stores in their marketing areas. Value House's efforts to purchase ovens from other Amana distributors were rebuffed after Boyd notified Value House that it would no longer sell to it. Finally, Value House was notified by an independent wholesaler located in New York that it could no longer supply Value House with Amana ovens. From this evidence, the jury could reasonably infer that Boyd and at least one of the other named coconspirators, The Plymouth Electric Company, Amana Refrigeration New York, or The Cooper Distributing Company, agreed to allocate exclusive territories among themselves for the sale of Amana microwave ovens and keep Value House from selling in their territories.

The evidence was also sufficient for a finding that the conspiracy was the proximate cause of Boyd's refusal to sell to Value House. In *Story Parchment Company v. Paterson Company,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), the Court discussed the question of proximate cause where defendant claimed that plaintiff's failure was due to lack of capital or inefficient management, not the antitrust conspiracy. In reversing the finding of the circuit court that plaintiff had not proved that the depreciation in value of its plant was due to any violation of the Sherman Act the Court stated:

> But this conclusion rested upon inferences from facts within the exclusive province of the jury, and which could not be drawn by the court contrary to the verdict of the jury without usurping the functions of that fact finding body. Whether the unlawful acts of respondents or conditions apart from them constituted the proximate cause of the depreciation in value, was a question, upon

the evidence in this record, for the jury "to be determined as a fact, in view of the circumstances of fact attending it." *Milwaukee & St. Paul Ry. Co. v. Kellogg,* 94 U.S. 469, 474 [24 L.Ed. 256]. And the finding of the jury upon that question must be allowed to stand unless all reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts.

*Id.* at 566, 51 S.Ct. at 252 (citations omitted).

We do not think that "reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts" here.

Boyd argues that there were two equally plausible inferences to be drawn from the evidence: that Boyd stopped selling to Value House for independent business reasons, or that it stopped selling to Value House in furtherance of a conspiracy to restrain trade. Boyd then cites *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1966), for the proposition that between two equally plausible inferences the nonculpable one must prevail. Boyd quotes the following language:

> Therefore, not only is the inference that Cities' failure to deal was the product of factors other than conspiracy at least equal to the inference that it was due to conspiracy, thus negating the probative force of the evidence showing such a failure, but the former inference is more probable.

*Id.* at 280, 88 S.Ct. at 1588. But the Court was not discussing the fact finder's role after a full trial; it was reviewing the propriety of an award of summary judgment. *Id.* at 258, 88 S.Ct. at 1577. It is exclusively for the jury, not the court, to draw inferences from the evidence and make findings of fact. *Story Parchment Company v. Paterson Company,* 282 U.S. at 566, 51 S.Ct. at 251.

Although Boyd advanced sound independent business reasons [3] for its termination

---

**3.** The most compelling reason was the extra cost involved in servicing and repairing ovens in another distributor's territory.

of Value House as a customer, the jury was not compelled to accept its explanation. The timing of the cutoff, following complaints by the New York and New Jersey distributors of Value House incursions into their territories, the contacts between Boyd and the other distributors, particularly Cooper, and the inability of Value House to purchase Amana microwave ovens from any source was more than sufficient for a finding of proximate cause.

■ We turn next to Boyd's contention that it was error for the court to submit the case to the jury on the *per se* theory of liability. *Per se* violations of the Sherman Act have been described as "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

> One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a "horizontal" restraint, in contradistinction to combinations of persons at different levels of the market structure, *e.g.,* manufacturers and distributors, which are termed "vertical" restraints. This Court has reiterated time and time again that "[h]orizontal territorial limitations ... are naked restraints of trade with no purpose except stifling of competition." *White Motor Co. v. United States,* 372 U.S. 253, 263 [83 S.Ct. 696, 702, 9 L.Ed.2d 738] (1963). Such limitations are *per se* violations of the Sherman Act.

*United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972) (citations omitted). The evidence here established a "horizontal" restraint. There was an agreement between distributors of Amana microwave ovens to allocate territories and eliminate Value House as a competitor to distributor-serviced retailers outside of Boyd's territory.

The effect was to minimize competition among the Amana distributors. This is what triggers the *per se* rule.

■ Contrary to Boyd's contention, this was not a vertical arrangement. Vertical arrangements start with the manufacturer and extend down the line through distributor to retailer. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Nor do we see any merit in the argument that Boyd and Value House had to be competitors for the *per se* rule to apply. In *Engine Specialities, Inc. v. Bombardier Limited,* 605 F.2d 1, 10–11 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839, *reh'g denied,* 449 U.S. 893, 101 S.Ct. 259, 66 L.Ed.2d 123 (1980), we held that two manufacturers who conspired to allocate geographical markets had committed a *per se* violation of section 1 of the Sherman Act; the injured plaintiff was not a competing manufacturer, but a former distributor of one of the manufacturers.

### The Jury Instructions

■ Our principal focus in reviewing jury instructions is to determine whether they tended to confuse or mislead the jury on the controlling issues. *Green v. Edmands Company,* 639 F.2d 286, 289 (5th Cir.1981); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2558 at 668 (1971).

■ "As long as the judge's instruction properly apprises the jury of the applicable law, failure to give the exact instruction requested does not prejudice the objecting party." *McKinnon v. Skil Corp.,* 638 F.2d 270, 274 (1st Cir.1981). On appeal, the charge must be examined as a whole; portions of it are not to be treated in isolation. *Charles A. Wright, Inc. v. F.D. Rich Co.,* 354 F.2d 710, 713–14 (1st Cir.1966).

■ The instructions requested by Boyd and rejected by the court were either incorrect, or inapplicable, or added nothing of consequence to the charge as given. Boyd

argues that, because the case was submitted on the *per se* theory, it was prejudicial error for the court not to instruct the jury to disregard the evidence on the adverse competitive effects of Boyd's territorial resale restriction and upon the prices of such products to the consumer. This overlooks the fact that in order to prove a conspiracy, there must be evidence of motive and intent. The anticompetitive effect of the market allocation was such evidence.

We have already discussed and rejected, *supra* at 949, Boyd's contention that the jury should have been instructed to accept, as between two reasonable inferences, the nonculpable one.

We find no errors in the jury charge.

*Motion For a New Trial*

The reasons advanced by Boyd for a new trial are the same that we discussed and rejected in finding that the district court did not err in denying Boyd's motions for a directed verdict and judgment n.o.v. The district court did not abuse its discretion in denying Boyd's motion for a new trial.

## II. DAMAGES

Prompted, undoubtedly, by the decision in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568, Amana revised its distribution agreements effective January 1, 1978, by imposing the following resale restrictions: distributors were permitted to sell only to authorized Amana dealers located within the distributor's exclusive territory, and distributors were required to obtain franchise agreements from their dealers restricting sales exclusively to consumers at authorized locations. A distributor promotional service charge-back policy announced by letter of October 3, 1977, was included in the revised agreement.

It is not disputed that Boyd entered into the January 1, 1978 agreement with Amana.

Prior to January 1, 1978, Amana distributors were assigned primary territories for concentration of sales efforts. Distributors were not prohibited from selling outside their primary territory and no limiting franchise agreement with dealers was required.

Plaintiff here, SMC, was sued in 1980 by Davis-Watkins Company, an exclusive distributor of Amana microwave ovens, for violation of the Robinson-Patman Act. SMC counterclaimed against Davis-Watkins and Amana alleging violations of section 1 of the Sherman Act. The district court submitted the case to the jury on the rule-of-reason theory and limited it to nonprice vertical restraints. The verdict was in favor of the distributor and Amana, finding no unreasonable restraint of trade in violation of section 1 of the Sherman Act. The Sixth Circuit affirmed, holding, *inter alia,* that *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568, mandated the application of the rule-of-reason theory. *Davis-Watkins Company v. Service Merchandise,* 686 F.2d 1190 (6th Cir.1982), *petition for cert. filed,* 51 U.S. L.W. 3421 (Nov. 30, 1982).

Early in the trial of the instant case, Boyd moved to preclude evidence of damages after December 31, 1977, relying upon the adjudicated facts and rulings in *Davis-Watkins.* The district court granted the motion, stating:

The Court will state briefly the basis of its ruling. The record presently before this Court, supplemented by the findings and rulings of the Sixth Circuit in *Davis-Watkins,* makes clear that the alleged November, 1977, unlawful conspiracy between this defendant and other distributors of Amana Microwave Ovens was not and could not have been a proximate cause of any lost profits or other damages sustained by Value House after the effective date of the revised distributor agreement executed by this defendant. The factual findings and rulings of the Sixth Circuit in *Davis-Watkins* establish that the marketing systems of Value House and Amana are completely incompatible. Because of this, after the effective date of the revised distributorship agreement, Value House would have been unable to obtain Amana Microwave Ovens by reason, not of any 1977 conspiracy to re-

strain trade, but by reason of the terms of the revised distributorship agreement.

Plaintiff in the present case does not challenge the legality or validity of the Amana Revised Distribution System. It was an issue presented by Service Merchandise's counterclaim in *Davis-Watkins.* Its legality was determined by the Court in that case and, as the Court has just indicated, that ruling is not here challenged.

■ We do not quarrel with SMC's statement that the 1978 Amana distributorship had no bearing on the unlawful acts of Boyd preceding it. Boyd's liability for those acts has been established and the damages incurred by plaintiff up to January 1, 1978, were stipulated. The question is when the damages caused by Boyd ceased. After January 1, 1978, Boyd could no longer sell ovens to SMC, even if it wanted to, or to put it in the context of this case, Boyd's illegal conspiracy with the other dealers had been superseded by the legal vertical restraints imposed by Amana. The effect on SMC was the same as if Boyd had gone out of business on January 1, 1978.

SMC's argument that the court improperly applied the doctrine of collateral estoppel is far off target. That doctrine was not implicated at all. SMC did not challenge the validity or legality of the Amana distributorship agreement with Boyd. The court simply ruled, as a matter of law, and we think properly so, that because the restrictions imposed on Boyd by Amana made it impossible for Boyd to sell ovens to SMC after January 1, 1978, damages ceased as of that date. The issue is one of causation, not collateral estoppel.

Plaintiff makes the bold assertion that "subsequent events cannot, as a matter of law, cut off Plaintiff's damages." The cases cited, however, in support are either inapposite or inapplicable. In *M.O. Dantzler v. Dictograph Products, Inc.,* 309 F.2d 326 (4th Cir.1962), the court stated, "[t]he test is whether the damages were caused by the unlawful acts of the defendants." *Id.* at 329. As already pointed out, plaintiff has been awarded the damages caused by the unlawful acts of the defendant.

Most of the discussion of damages in *Arthur Murray, Inc. v. Reserve Plan, Inc.,* 406 F.2d 1138, 1146–51 (8th Cir.1969), focuses on the computation of the damages. The court found that the violations of the antitrust laws damaged the plaintiff's business and that damages should be recovered to the date suit was filed because they were proximately caused by the wrongful acts of defendants. *Id.* at 1150. This was not, however, announced as a general rule of law in antitrust cases; it was a holding on causation in the context of the case.

Nor does *William H. Rankin Co. v. Associated Bill Posters of United States and Canada,* 42 F.2d 152 (2d Cir.1930), stand for the rule plaintiff asserts. The issue was whether the effect on plaintiffs of the illegal acts of defendants committed before the entry of a court decree ended with entry of that decree. The court found this was a question of fact and that the decree could not, as a matter of law, override evidence showing "continuing damage directly traceable to the defendants' former unlawful interference." *Id.* at 155. There was no evidence here, and we are hard put to think of how there could have been any, of the continuing effects of Boyd's refusal to sell in November 1977 after January 1, 1978. At the risk of being repetitious, we point out again that SMC was awarded full damages for the orders Boyd refused to fill.

Finally, plaintiff misreads *Connecticut Importing Co. v. Continental Distilling Corporation,* 129 F.2d 651 (2d Cir.1942), as well as not citing it correctly. In *Connecticut Importing,* the price-fixing defendant distributors urged that the effective date of the Miller-Tydings Act, amending section 1 of the Sherman Act to allow price-fixing between buyers and sellers, should be the cutoff date for plaintiff's damages. In rejecting this contention, the court pointed out:

But the Miller-Tydings Act did not relieve the acts of the defendants from illegality. On the contrary, it specifically provided that in spite of the exemption permitting an agreement between a buyer and seller to fix prices it would still be

unlawful for distributors of commodities to conspire together to fix prices.

*Id.* at 654. The court then went on to discuss the question of causation as it related to damages.

We have found no cases standing for the broad proposition plaintiff urges. In *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), the Court pointed out that in the context of a continuing antitrust conspiracy "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* at 338, 91 S.Ct. at 806. The Court then held:

> Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action. On the other hand, it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.

*Id.* at 339, 91 S.Ct. at 806. Here, the conspiracy ended by fiat of Amana on January 1, 1978. Plaintiff stipulated to the amount of damages incurred up to that date. There were no future damages that might arise after that.

Finally, we consider plaintiff's claim that the court erred in denying its motion to supplement the record to show damages after December 31, 1977. Plaintiff argues that it became apparent at trial that there were periods of time after January 1, 1978, during which Boyd was not bound by the Amana distributorship restrictions. This is not apparent to us from the record. The evidence is to the contrary; Boyd executed the first restrictive agreement on January 19, 1978, but it expressly stated that its effective date was January 1, 1978. The subsequent distributor agreements became effective January 1 of each succeeding year. This meant that Amana's vertically imposed territorial selling restrictions commenced on January 1, 1978, and continued on a year-to-year basis.

Moreover, this was a matter within the discretion of the district court. SMC, as a party in the *Davis-Watkins Co.* case, knew, or should have known, that the decree in that case would loom large in its action against Boyd. No offer of proof was tendered during trial to show how or why damages were incurred after January 1, 1978. There must be a halt at some time to a case, no matter how important it appears to a party. The district court did not abuse its discretion in denying plaintiff's post-trial motion to supplement the record.

*Affirmed. Remanded for a determination of the award of attorney's fees.*