Eric WILSON, Plaintiff, Appellee,

v.

MARITIME OVERSEAS CORPORA-
TION and Cambridge Tankers,
Inc., Defendants, Appellant.

No. 97–1804.

United States Court of Appeals,
First Circuit.

Heard Dec. 2, 1997.

Decided July 10, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 18, 1998.

Thomas E. Clinton, with whom Clinton & Muzyka, P.C., was on brief for Maritime Overseas Corporation and Cambridge Tankers, Inc.

Michael B. Latti, with whom Carolyn M. Latti and Latti Associates LLP, were on brief for Eric Wilson.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and LYNCH, Circuit Judge.

TORRUELLA, Chief Judge.

Eric Wilson, chief mate on an oceangoing oil tanker owned by defendant-appellant Cambridge Tankers, Inc., was injured during a voyage as he attempted to repair hydraulic fluid lines that were leaking inside one of the main cargo holds. He filed suit in the district court against Cambridge Tankers, as well as against his employer, Maritime Overseas Corporation, asserting claims under the Jones Act, 46 U.S.C.App. § 688, for negligence, and under the general maritime law for unseaworthiness and for maintenance and cure. After trial, the jury awarded Wilson $2,000,000 in compensatory damages. The defendants now appeal from the verdict, arguing that the district court erred both in failing to instruct the jury on comparative negligence and the primary duty rule, and in denying their motion for a remittitur. We remand for a new trial on all issues.

## I. *Background*

"We ... review the evidence developed at trial in the light most favorable to [the verdict]." *Toucet v. Maritime Overseas Corp.*, 991 F.2d 5, 7 (1st Cir.1993).

The plaintiff, Eric Wilson, was employed as a chief mate by Maritime Overseas Corporation on the M/T OVERSEAS BOSTON, which was owned, operated, and controlled by Cambridge Tankers, Inc. (collectively, "the defendants"). On January 19, 1994, the OVERSEAS BOSTON was approximately 75 miles off the western coast of Mexico on its

way to Valdez, Alaska. The plaintiff was in a Zodiac inflatable raft in the vessel's No. 2 center cargo tank ("tank No. 2C") trying to patch two leaking hydraulic lines.

The decision to patch the lines while the OVERSEAS BOSTON was underway was made jointly by the captain, the chief engineer, and Wilson, the chief mate. Several hydraulic lines had been leaking since at least 1991, and Wilson and others had placed numerous requests with the vessel's owners to replace the lines at a shipyard.[1] The hydraulic lines, made out of copper beryllium, control the valves that regulate the flow of petroleum into and out of the ship. The leaks in the lines were a constant source of worry on the OVERSEAS BOSTON because, if the hydraulic system failed, the valves could open without warning, creating the possibility of an oil spill. The defendants' established procedure for patching hydraulic lines was to fill the tank with seawater to a height sufficient to allow a seaman on a raft floating inside the tank to reach the hydraulic line in question. The leaking section of pipe is then cut and replaced with a new stainless steel section. There was no other equipment available on the OVERSEAS BOSTON with which to repair the lines.[2]

The lines that Wilson was patching on the day of the accident ran vertically down one side of tank no. 2C. These lines were leaking near the top of the tank, which is seventy-five feet deep. To reach the lines, Wilson had the tank filled up to approximately the sixty-five foot mark, so that the raft could float within eight to ten feet of the deck above. However, the underside of the deck on the OVERSEAS BOSTON is spanned from port to starboard by large metal I-beams, whose vertical span is about five feet. Thus, the clearance between the bottom of each beam and the surface of the water was only approximately three to five feet.

Wilson and a seaman climbed aboard the raft, and Wilson knelt in the forward section

to paddle the raft toward the leaking lines. The beams were about one or two feet above his head. Proceeding in this manner, Wilson and the seaman went under two beams without incident. Unbeknownst to Wilson, however, the vessel changed course while he was still paddling. Although the captain and officers on the bridge knew that Wilson was in the tank, and could communicate with him by hand-held radio, they failed to warn him of the impending change of course. Unfortunately, there was a wave in the tank (attributed by Wilson to the change in course), which lifted the raft and slammed Wilson against a beam.

Although he was in pain, Wilson assumed that he had not been seriously injured, and decided to continue patching the lines. When he exited the tank about an hour later, he mentioned to the chief engineer that he had hurt his back. The captain examined Wilson's back, and told him to rest in his cabin until he felt better. The pain did not go away, however, and Wilson left the ship to be examined by doctors. He was told at first that his pain was most likely due to a bad sprain and injury to the soft tissues along his spine. After several months, however, Wilson was still in pain, especially when he bent his back or climbed stairs. Wilson thus consulted a second doctor, who determined that Wilson had fractured his spine at the T8 vertebra. Wilson remained on medical leave the rest of 1994, during which he underwent various rehabilitative treatments for his injury, including wearing a back brace for four months, and receiving frequent steroid injections to build up the muscles in his back.

In January 1995, Wilson's condition had improved enough that he was allowed to go back to work as a chief mate on a trial basis. He was assigned to work on the OVERSEAS NEW YORK while it was moored for maintenance and repairs in Portland, Oregon. This trial period lasted for sixty-five days, during which it became apparent that Wilson's abili-

---

1. The lines were not permanently repaired until after the plaintiff's accident.

2. The evidence showed that one safer alternative method of repairing hydraulic lines is to assemble scaffolding inside the tank, thus providing a

stable platform for the persons performing the repair work. The OVERSEAS BOSTON, however, did not carry scaffolding, so this type of repair could not performed while the ship was underway.

ty to perform his duties as a chief mate was compromised by the pain that he frequently suffered while climbing stairs or performing other physically-strenuous tasks. Nevertheless, his performance of other duties was exemplary, and he was recommended for promotion to captain, which was a less physically-demanding job.

During the summer of 1995, in preparation for his imminent promotion, he was assigned to the OVERSEAS CHICAGO for approximately one month attached to its captain in preparation for his own promotion to captain. Captain Olsen, the OVERSEAS CHICAGO's captain, reported that Wilson had performed very well, and that his promotion was both warranted and due. A short time later, Wilson was asked to obtain a medical certificate that he was fit for administrative duties as captain.

After obtaining a certification that he was fit for administrative duty as a captain, Wilson was assigned to relieve Captain Olsen on the OVERSEAS CHICAGO, which was berthed in Portland, Oregon. On August 15, 1995, he flew out to Portland, went to the OVERSEAS BOSTON, and exchanged command of the ship with Captain Olsen. An hour or two later, Captain Olsen returned and told Wilson that he had to speak to his superiors at Maritime Overseas' headquarters in New York. When Wilson placed the call, he was told that the medical certificate was not satisfactory, because it did not certify that he was fully fit for any duty on the ship. Captain Olsen was ordered to relieve Wilson of his command and march him off the ship. Wilson was given $500 and told to stay at a nearby hotel until the matter could be sorted out. However, after waiting several days without hearing anything further, Wilson flew back to his home in Maine.

Soon afterwards, Wilson filed the instant suit in the U.S. District Court for the District of Massachusetts, alleging both diversity and federal question jurisdiction. *See* 28 U.S.C. §§ 1331, 1332. In his complaint, Wilson claimed that his injuries were caused both by the OVERSEAS BOSTON's unseaworthy condition and by the bridge officers' failure to warn him of the impending course change.[3] In their answer to the complaint, the defendants denied Wilson's allegations of unseaworthiness and negligence, and claimed as affirmative defenses that the sole cause of Wilson's injuries was either his own negligence, or his failure to properly perform his duties as chief mate.

A jury trial started on February 10, 1997. At the end of the plaintiff's case, the defendants moved for judgment as a matter of law on the unseaworthiness and negligence claims. On February 19, 1997, the last day of trial, the district court summarily denied the motion. The court also denied the defendants' request that he instruct the jury on comparative negligence and the primary duty rule, as well as their request that the jury questionnaire contain questions on those affirmative defenses.

The following day, the jury returned a special verdict for Wilson, finding that the OVERSEAS BOSTON was unseaworthy, that the defendants had been negligent, that both the unseaworthiness and negligence had been proximate causes of Wilson's injuries, that his pre- and post-judgment damages totaled $2,000,000, and that he was entitled to pre-judgment interest. On February 28, 1997, the district court entered judgment in accordance with the verdict in the amount of $2,139,804.93.

The defendants timely filed three post-judgment motions: a renewed motion for judgment as a matter of law, a motion for a new trial, and a motion for remittitur. The district court denied all three motions by means of a one-page order dated June 5, 1997. The defendants now appeal from the denial of their motions.

## II. *Objections to instructions*

### A. **Standard of review**

The defendants' primary argument is that the jury's verdict should be set aside and the case remanded for a new trial because the jury instructions and questionnaire were incorrect as a matter of law, and because these

---

**3.** The complaint also alleged a cause of action for maintenance and cure under the general maritime law, but the parties settled this aspect of the dispute before trial.

errors prejudiced them. Before reaching the merits of the defendants' objections, however, we must resolve the threshold issue of whether the defendants properly preserved their objections.

Objections to instructions must comply with Fed.R.Civ.P. 51, which provides in pertinent part:

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

Objections must also comply with Fed. R.Civ.P. 49(a). Rule 49(a) permits a court to require a jury to return only a special verdict in the form of a special written finding upon each issue of fact, and requires the court to give such instructions to the jury "concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue." More to the point, Rule 49(a) further provides:

> If in so doing, the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury.

Both Rule 49(a) and Rule 51 thus require the objecting party to state its objections after the charge but before the jury retires. "The object of [these rules] is to afford the trial judge an opportunity upon second thought, and before it is too late, to correct any inadvertent or erroneous failure to charge." *Marshall v. Nugent,* 222 F.2d 604, 615 (1st Cir.1955).

■ Thus, "[s]ilence after instructions, including instructions on the form of the verdict to be returned by the jury, typically constitutes a waiver of any objections." *Putnam Resources v. Pateman,* 958 F.2d 448, 456 (1st Cir.1992). It must be emphasized that "[i]t is an ironclad rule in this circuit

that failure to renew objections *after* the charge constitutes waiver of any claim of error." *United States v. Richardson,* 14 F.3d 666, 670–71 (1st Cir.1994) (citation omitted) (emphasis added); *see also Marshall,* 222 F.2d at 615.

■ If a party's objections comply with Rules 49(a) and 51, "then the 'harmless error' standard of Rule 61 governs the trial or appellate court's consideration of any request for relief based on the alleged error." *Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 939 (1st Cir.1995).[4] Rule 61 provides that "[n]o error ... in anything done or omitted by the court ... is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61; *see also* 28 U.S.C. § 2111; Fed.R.Crim.P. 52. An error is not harmless if the court is "in grave doubt as to the harmlessness of an error that affects substantial rights." *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *see also Scarfo,* 54 F.3d at 939–40 (citing *O'Neal*).

■ The failure to preserve objections does not entirely preclude our review. In such cases, however, we review only for plain error. *See Moore v. Murphy,* 47 F.3d 8, 11 (1st Cir.1995). "For an error to be such, it must indeed be 'plain,' or 'obvious,' ... and it *must* 'affect substantial rights,' Fed. R.Crim.P. 52(b), that is, '[i]t must have affected the outcome of the district court proceedings.'" *United States v. Fernandez,* 145 F.3d 59, 63 (1st Cir.1998) (citation omitted) (emphasis added). Thus, whereas plain error review permits reversal only when the court is certain that substantial rights were affected, harmless error review requires reversal whenever the court harbors grave doubts as to whether the alleged error affected substantial rights.

■ Moreover, even when a district court's instructions are plainly erroneous, we will not remedy any such errors "[u]nless [we

---

4. "While in a narrow sense Rule 61 applies only to the district courts, *see* Fed.R.Civ.P. 1, it is well-settled that the appellate courts should act in accordance with the statutory policy embodied in Rule 61.... Congress has further reinforced the application of Rule 61 by enacting the harm-less error statute, 28 U.S.C. § 2111, which applies directly to appellate courts and which incorporates the same principle as that found in Rule 61." *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (citations omitted).

conclude] that the charge has caused a miscarriage of justice or has undermined the integrity of the judicial process." *Scarfo*, 54 F.3d at 940. Otherwise, "the charge is treated as having an effect closely analogous to [the] law-of-the-case doctrine, and for similar reasons of policy and fairness of process." *Id.; see also Coy v. Simpson Marine Safety Equip., Inc.*, 787 F.2d 19, 25 (1st Cir.1986); *Carrillo v. Sameit Westbulk*, 514 F.2d 1214, 1219 (1st Cir.1975); *Bouley v. Continental Cas. Co.*, 454 F.2d 85, 88 (1st Cir.1972); *Dunn v. St. Louis–San Francisco R.R. Co.*, 370 F.2d 681, 684 (10th Cir.1966) (Aldrich, J., sitting by designation); *see generally United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (under Fed.R.Crim.P. 52(b), a forfeited claim of error may be noticed on appeal only if error is plain, affects substantial rights, and a miscarriage of justice would otherwise result).

■ Satisfying Rule 51 requires more than a timely objection. The party making the objection must also state "distinctly the matter objected to and the grounds for the objection." Fed.R.Civ.P. 51. "Failure to object with the requisite particularity forfeits review under the 'harmless error' rule." *Play Time, Inc. v. LDDS Metromedia Comm., Inc.*, 123 F.3d 23, 29 (1st Cir.1997).

> This is not a merely technical requirement serving no useful end. Trial judges are not mind readers. If there is a problem with the instructions, the judge must be told precisely what the problem is, and as importantly, what the attorney would consider a satisfactory cure.

*Linn v. Andover Newton Theological Sch.*, 874 F.2d 1, 5 (1st Cir.1989). Thus, for example, this circuit has previously held that where a district court had first indicated that it intended to give an instruction, but later failed to do so, the appellant's reading a list of the numbers of the requested instructions was not sufficient to preserve an objection under Rule 51. *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 858–59 (1st Cir.1985). The panel stated that, because the objection was not accompanied by any argumentation, it was "impossible for this Court on appeal to

know whether the district judge reconsidered his original decision that this instruction was proper, or simply omitted this instruction through inadvertence." *Id.*

Finally, we note that objections to instructions need not be formal; "it is sufficient that a party ... *makes known to the court* the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor." Fed. R.Civ.P. 46 (emphasis added); *see also Carrillo*, 514 F.2d at 1218. The emphasis is not on the form of objections, but rather on ensuring that the trial court had actual notice of the nature and grounds of the objection. In one case, therefore, a prior panel of this court found that a party had preserved its objections under Rule 51 by reserving them in advance, when it was clear that the court had understood the objections. *See Bouley*, 454 F.2d at 88; *cf. Harrington v. United States*, 504 F.2d 1306, 1316–17 (1st Cir.1974) (objections were preserved by brief post-charge statement on the record, where parties had discussed the requested instructions with the judge at length but off the record). However, "we warn parties that there is a heavy burden upon them in such event to show that it was done with sufficient specificity and distinctness, and we caution district courts to be slow in tolerating such procedure." *Dunn*, 370 F.2d at 685.

Thus, we must determine whether the defendants properly preserved their objections to the district court's decision not to charge the jury on their affirmative defenses. If the objections were preserved, then we evaluate whether the district court's decision was erroneous. Finally, if the district court erred, we must ascertain whether the error was harmful. Only if the answer to the last question is affirmative may we vacate the judgment of the district court.

### B. Application

■ The case before us is a close one. Taken alone, the defendants' post-charge objections might well be insufficient to satisfy Rule 51.[5] However, this case presents a

---

**5.** Immediately after the court finished charging the jury, the defendants' counsel, Mr. Clinton, stated his objections for the record, as follows:

peculiar factual scenario. A perusal of the record and trial transcript reveals that, because the district court was familiar with the defendants' arguments, the post-charge objections submitted by defendants' counsel were sufficient to give the district court notice of which instructions' absence they objected to, as well as the grounds therefor.

As a general matter, we have noticed that throughout the trial, the district court handled all objections to its rulings in an expeditious and efficient manner. Once the court had heard an argument, understood it, and ruled upon it, it did not want to go over the same ground again. The court thus requested that counsel subsequently state their objections for the record as concisely as possible, discouraging them from repeating at length again the basis for their objections.

The transcript indicates that the court was well aware of the grounds for the defendants' objections to the lack of instructions on comparative negligence and the primary duty rule. The record of this case included a copy of the defendants' first motion for judgment as a matter of law, on the cover of which the court had written its ruling—"Denied." The motion was accompanied by a memorandum of law discussing at length the defendants' contention that the evidence heard at trial established that Wilson had both been comparatively negligent and been injured solely as a result of his violation of his own duty to maintain a safe working environment. Although it is not clear whether the motion was entered on the case docket, we strongly suspect that the handwritten ruling denying the motion is the ruling to which Mr. Clinton refers to in the following exchange:

> MR. LATTI [Plaintiff's counsel]: I'd like to move at this time for a judgment as a matter of law on the issue of contributory negligence of the plaintiff.
>
> THE COURT: I will not charge on contributory negligence.
>
> MR. LATTI: All right. When you say you're not going to charge, is that an issue?
>
> THE COURT: It's not an issue.
>
> MR. LATTI: All right.
>
> MR. CLINTON [Defendants' counsel]: *He addressed it the other day, and I understood the ruling. (Indicating document.)*

Transcript, at 6–57 (emphasis supplied).[6] In any case, this excerpt makes it evident that by the sixth day of trial, the court had been presented with detailed arguments on the issues of comparative negligence and the primary duty rule, and had determined that there was insufficient evidence to justify instructing the jury on those issues.

A subsequent bench conference, during which the court ordered the parties to agree upon a special verdict form, showed that all of the participants, including the deputy clerk, knew quite well that the court had ruled that no instruction on comparative negligence would be given. Wilson contends that the defendants' failure to argue their objections forcefully and in detail indicates that those objections had been waived. We

---

MR. CLINTON: As previously discussed, I'd like to put on the record my objection for the failure to give a charge on contributory negligence and the Defendant's requests 21, 22, 23, 24, and 26, which dealt with contributory negligence.

The defendant also objects to the failure to give a charge under *Peymann* of the primary duty rule. He was a chief mate in charge of the operation, and had the sole judgment of doing the work in the tank. In particular, requests 27, 28, 29, and 30 . . . .

THE COURT: Is that it? Are you through?

MR. CLINTON: Yes.

THE COURT: All right. Your objections are noted.

Transcript, at 7–76. Defendants' counsel was referring to *Peymann v. Perini Corp.,* 507 F.2d 1318 (1st Cir.1974), which we discuss elsewhere in this opinion.

**6.** We also note that this excerpt from the transcript suggests that the district court granted the plaintiff's motion for judgment as a matter of law on the issue of contributory negligence, in which case the ruling would be appealable even without contemporaneous objection. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 513–14, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); *see also* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2536, at 332 (1995) ("The grant of judgment as a matter of law is not an instruction within the meaning of Rule 51. Thus, *it is reviewable even though the party* against whom the judgment was granted did not object before the jury retired."). We need not decide this issue, however, because we conclude that the defendants did preserve their objections.

disagree. In light of the court's policy toward objections, in general, and of its prior rulings on the issues of comparative negligence and the primary duty rule, in particular, we read the exchange that occurred during that bench conference as indicating only that the defendants were following the court's instructions to hold their objections until after the charge, when they would be restated concisely to preserve them for appeal.

After the parties' closing arguments, and immediately before the court began its instructions, Mr. Clinton sought some changes to the jury instructions. The judge denied the request, stating: "You listen to my instructions. I am sure you won't like them, but you can save your rights after I am through. Okay?" The court's response corroborates our general impression: that the district court had heard, understood, and denied the defendants' requests for instructions, but that it properly allowed the defendants to preserve their objections for appeal.

After the court instructed the jury, but before the jury retired to deliberate, another bench conference was held, during which the defendants' counsel stated his objections for the record. *See supra* note 5. As we mentioned above, if this had been the only objection made by the defendants, it probably would not have sufficed to meet the requirements of Rule 51. In the context of the facts of this case, however, we deem the objection sufficiently detailed to alert the court of its nature and grounds. It is evident that the court clearly understood the gist of the defendants' arguments and had already reached a determination upon the merits of those arguments. The court did not, however, wish to curtail the defendants' right to appeal its determination, so it allowed their counsel to state their objections for the record in abbreviated form.

We ended our discussion of practice under Rules 49(a) and 51 by noting that, notwithstanding how strictly they are applied, there will exist a few, rare occasions in which we will deem objections to have been preserved if it is shown that the district court had actual notice of the nature and grounds of the objections. This case is one such occasion. Earlier in the trial, the district court had clearly rejected the defendants' motion for judgment as a matter of law on the issues of comparative negligence and the primary duty rule. Subsequently, the court rejected their request for instructions on those issues, and thereafter discouraged the defendants' counsel from rehashing the objections repeatedly, other than merely noting them for the record. Considering the entire interaction between the court and counsel, we conclude that the defendants' counsel sufficiently apprised the court of their objections and the reasons therefor to preserve them for appeal.

## C. Failure to give instructions

Wilson argues that even if the defendants preserved their objections to the court's jury instructions and special verdict form, the court's decision not to instruct on comparative negligence and the primary duty rule was correct and therefore harmless. Wilson contends that the district court acted correctly in denying the defendants' request for instructions both because the instructions they proffered were incomplete, and because the evidence adduced at trial was not sufficient to allow a reasonable jury to conclude that he had either acted negligently or violated his duties as chief mate. We are not persuaded by either argument.

Courts often state in broad terms the rule that a trial court is under no obligation to accept a request for an instruction if the proffered instruction is incorrect in any way. For example, we have remarked that "the lawyer must propose a lawful instruction or correction, and not one that substantially overstates the law in that party's favor." *Parker v. City of Nashua*, 76 F.3d 9, 12 (1st Cir.1996) (citing *Scarfo*, 54 F.3d at 944). Other circuits hew to a similar line. *See, e.g.,* *Robinson v. Bump*, 894 F.2d 758, 761 (5th Cir.1990) ("If an objection is raised against the failure to grant a requested instruction, the correctness of the proposed instruction must be shown as a threshold matter.").

Of course, a court should not agree to give the specific instruction requested by a party if that instruction is incorrect as a matter of law. However, the position advocated by Wilson is a different one—that the trial

court's decision not to give any instructions on comparative negligence and the primary duty rule was correct precisely because the specific instructions proposed by the defendants were either incomplete or incorrect.

 Wilson's argument is surely wrong. There are two separate rules: a) a court must instruct the jury correctly and adequately on controlling issues, *see Sullivan v. National Football League*, 34 F.3d 1091, 1107 (1st Cir.1994), and b) a court need not accept a particular instruction if it does not accurately state the law, *see Jerlyn Yacht Sales, Inc. v. Roman Yacht Brokerage*, 950 F.2d 60, 68 (1st Cir.1991). Consequently, even though a trial court is under no obligation to give any particular requested instruction, "[i]f the request directs the court's attention to a point upon which an instruction to the jury would be helpful, the court's error in failing to charge may not be excused by technical defects in the request." 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2552 at 395–97 (1995); *see Ouimette v. E.F. Hutton & Co.*, 740 F.2d 72, 76 (1st Cir.1984). Accordingly, we need not decide whether the defendants' proffered instructions were correct as a matter of law. The requests sufficed to alert the district court to the need for some instructions, even if not the specific ones urged by the defendants, on the affirmative defenses of comparative negligence and the primary duty rule.

### D. Harmlessness of the error

 We come, therefore, to the merits of the dispute: did the district court err in failing to charge the jury on comparative negligence and the primary duty rule? As mentioned above, a district court is duty-bound to give instructions on all issues of material fact raised by the evidence adduced at trial. The standard for determining whether a factual issue is sufficiently contested to require an instruction is identical to the standard for determining whether a factual controversy prevents the entry of judgment

as a matter of law. *Compare Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1088 (1st Cir.1989) ("[A] mere scintilla of evidence is not enough to forestall a directed verdict, especially on a claim as to which the burden of proof belongs to the objecting party."); *with Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1297 (10th Cir.1989) ("There must be more than a scintilla of evidence to support an instruction."); *cf. United States v. Rodriguez*, 858 F.2d 809, 812 (1st Cir.1988) (In criminal cases, "the district court's task [of determining whether an issue requires an instruction] bears a resemblance to its function in determining whether or not a directed verdict or judgment of acquittal should be ordered.").

In neither situation may the court weigh the evidence, make credibility determinations, or resolve conflicts in the proof. Instead, the court must determine whether the evidence presented at trial, along with all inferences that may reasonably be drawn therefrom, could plausibly support a finding for either party on any given issue of material fact. *Cf. Transamerica Premier Ins. Co. v. Ober*, 107 F.3d 925, 929 (1st Cir.1997) (in the Rule 50 context, the court makes all reasonable inferences in favor of the non-moving party). "Because such a decision entails not differential fact-finding, but merely an inquiry into the legal sufficiency of the evidence, the standard of appellate review ... should be plenary." *Rodriguez*, 858 F.2d at 812; *see also Anderson*, 862 F.2d at 916 (determination whether fact omitted from special verdict form was material to the ultimate issues in the case reviewed *de novo*); *Connecticut Mut. Life Ins. Co. v. Wyman*, 718 F.2d 63, 65 (3d Cir.1983) (trial court's decision not to give instructions on a particular issue reviewed *de novo*); *but see United States v. Gomez–Osorio*, 957 F.2d 636, 642 (9th Cir.1992) (trial court's determination on issue whether required factual foundation existed to warrant particular jury instruction reviewed only for abuse of discretion).[7]

---

7. In comparison, once it has been determined that an instruction is called for, the district court's choice of wording is reviewed only for abuse of discretion. In doing so, "[o]ur principal focus ... is to determine whether [the in-

structions] tended to confuse or mislead the jury on the controlling issues.... [Thus], [o]n appeal, the charge must be examined as a whole; portions, of it are not to be treated in isolation." *Brown v. Trustees of Boston Univ.*, 891 F.2d 337,

Wilson contends that the evidence presented at trial was insufficient to allow a reasonable jury to find that he was contributorily negligent or that the only cause of his injuries was his violation of his duties as chief mate. We disagree. Unlike at common law, in both Jones Act and unseaworthiness actions, neither assumption of risk nor contributory negligence are available as complete defenses to liability. *See Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 429–33, 59 S.Ct. 262, 83 L.Ed. 265 (1939). Instead, the admiralty doctrine of comparative negligence applies. *See Jacob v. New York*, 315 U.S. 752, 755, 62 S.Ct. 854, 86 L.Ed. 1166 (1942). This defense requires, among other things, evidence that the seaman chose to perform a task in a manner that placed him in danger despite the fact that there were safer alternative means available to him. *See Burden v. Evansville Materials, Inc.*, 840 F.2d 343, 346 (6th Cir. 1988); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6–22 at 324 (2d ed.1994). A finding of "contributory negligence, however gross, is not a bar to recovery but only mitigates damages," *see Socony–Vacuum Oil Co.*, 305 U.S. at 431, 59 S.Ct. 262, reducing the plaintiff's recovery in proportion to his or her negligence. Thus, contributory negligence can be a complete defense when a jury finds that the plaintiff's own negligence was the sole proximate cause of the injuries.

The primary duty rule provides that a ship's officer may not recover against his employer for negligence or unseaworthiness when there is no other cause of the officer's injuries other than the officer's breach of his consciously assumed duty to maintain safe conditions aboard the vessel. *See Walker v. Lykes Bros. S.S. Co.*, 193 F.2d 772, 773 (2d Cir.1952). In *Boat Dagny, Inc. v. Todd*, 224 F.2d 208, 210–11 (1st Cir.1955), this circuit explained that the primary duty rule does not bar recovery where the plaintiff breached his duty but the ship's owner was also inde-

pendently at fault.[8] "Our decision merely followed the self-evident proposition that not every breach of duty will assign a seaman full responsibility for his injury." *Peymann v. Perini Corp.*, 507 F.2d 1318, 1323 (1st Cir.1974). The primary duty rule bars recovery only if there was no cause of the officer's injuries other than the breach of duty. "As Judge Hand noted in *Walker*, the bar is not based on the contributory negligence of the officer, but on a finding of no negligence of the employer." *Kelley v. Sun Transp. Co.*, 900 F.2d 1027, 1031 (7th Cir. 1990).

An instruction on comparative negligence must therefore be given if the evidence establishes a genuine controversy as to whether Wilson placed himself in foreseeable danger even though safer alternatives were available, and whether his choice was the proximate cause of his injuries. Similarly, an instruction on the primary duty rule must be given if the evidence establishes a genuine controversy as to whether Wilson owed a duty to the defendants, whether he breached the duty, and whether that breach was the *sole* proximate cause of his injury. *See Peymann*, 507 F.2d at 1323. We find that the evidence in this case was sufficient to allow a reasonable jury to find either that Wilson was contributorily negligent or that his injuries were caused exclusively by his own failure to perform his primary duties.

Evidence was presented at trial indicating that Wilson had not been ordered to patch the hydraulic lines while the OVERSEAS BOSTON was on the high seas. Indeed, the captain testified that it had been Wilson who had proposed that the lines be patched. He stated that the day prior to Wilson's accident, Wilson had been in tank No. 2C patching another set of hydraulic lines on the tank's aft bulkhead, near the bottom. While conducting those repairs, Wilson noticed that some of the lines on the forward bulkhead were also leaking, but at a much greater

353 (1st Cir.1989) (quoting *Service Merchandise Co. v. Boyd Corp.*, 722 F.2d 945, 950 (1st Cir. 1983)).

8. A Jones Act defendant may be found liable if the defendant's negligence played even the slight-

est part in producing the plaintiff's injury. *See Ferrara v. A. & V. Fishing, Inc.*, 99 F.3d 449, 453 (1st Cir.1996); *Toucet*, 991 F.2d at 10 ("A plaintiff's burden of proving causation under the Jones Act is featherweight.").

height. He therefore ordered that the tank be filled overnight to the 65 foot mark, so that he could patch the second set of lines the following day. In addition to the captain's testimony, the defendants' expert testified that no reasonable chief mate would have entered a tank that was filled so close to the deck when the vessel was under way on the high seas, much less without wearing a hard hat and life vest, because of the possibility that waves could form in the tank as a result of the normal movement of the ocean's surface.

Moreover, the plaintiff admitted that prior to this voyage, he had never performed repairs inside a tank while the ship was on the high seas. He also admitted that he had the authority to abort the operations at any point. Finally, Wilson testified that on the morning of January 19, 1994, when he first entered tank No. 2C, he found the water level too high and thus ordered it to be lowered an additional 12 to 18 inches. It was not until after the water level had been adjusted that he boarded the raft.

The evidence presented at trial created a genuine issue of fact as to whether Wilson had been contributorily negligent. For example, a reasonable jury could find that Wilson was acting under his own authority when he decided to patch the hydraulic lines, and that he was in control of the operation. A jury could find that Wilson should have known that entering a lightless tank when the water level is less than 10 feet from the deck (and less than 5 feet from the beams) and the ship is on the open sea could put him in harm's way if the water level shifted, and that he should have foreseen that the swells and waves on the ocean's surface could cause the water inside the tanks to shift. Similarly, a jury could infer that Wilson knew that the repairs were dangerous from his adjustment of the water level prior to boarding the raft, and from his admission that he had never performed this type of repair when the ship was outside of a harbor. A jury could also believe that the wave in the tank was not caused by the vessel's course change, which would undermine Wilson's claim that his injuries were causally related to the defendants' negligence.

Finally, and most importantly, a jury could conclude that Wilson was negligent because a safer course of action had been available to him. *See Burden,* 840 F.2d at 346. A jury could find that it was not necessary for the lines to be repaired while the ship was at sea. A jury could therefore find that Wilson could have chosen to wait until the OVERSEAS BOSTON reached the port at Valdez, Alaska, to perform the repairs on the hydraulic lines.

This evidence, together with testimony indicating that Wilson's duties as chief mate included responsibility for the safety and maintenance of the ship, in general, and of the line patching operation, in particular, also suffices to permit a jury to conclude that the only proximate cause of Wilson's injuries was his own failure to perform his duties as chief mate to maintain a safe working environment.

Of course, we do not mean to imply that the evidence compels the conclusion that Wilson was contributorily negligent or that he was injured solely as a result of his violation of his duties. In fact, a jury could just as easily disbelieve all of the testimony mentioned above, or draw different inferences from it. We merely point out that the evidence could have been believed by a jury and could justify a finding that he had acted negligently. The defendants were therefore entitled to instructions on both affirmative defenses.

■■■ Moreover, the district court's erroneous failure to charge the jury on these issues was not harmless error. *See* Fed. R.Civ.P. 61. A compelling argument could be made that the failure to give any instructions on a material issue is harmful per se, but, in any case, the omission of these particular instructions was clearly harmful. The fact that the jury found for Wilson in this case does not persuade us otherwise, because we are in grave doubt as to whether the jury would have found that Wilson had not been negligent at all, had the jury been instructed as it should have been. For example, even though the defendants provided evidence at trial that Wilson's breach of his duty to ensure that shipboard repairs are carried out safely was the sole cause of his accident, the lack of an instruction on the primary duty

rule could have allowed the jury to ignore Wilson's own actions and thereby to seek another explanation for his accident. Similarly, the lack of an instruction on comparative negligence permitted the jury to find that the defendants were, in effect, 100% comparatively negligent even though the evidence could support a finding that Wilson was at least partially responsible for his own injuries.

Accordingly, a new trial is required so that a jury may properly consider the plaintiff's actions along with the defendants' in determining liability. *See Allen v. Chance Mfg. Co.*, 873 F.2d 465, 469–70 (1st Cir.1989) (erroneous jury instruction requires new trial if the error could have affected the result of the jury's deliberations).

### III. *Separability of issues on remand*

Wilson requests that, if the case must be remanded because of an error in the instructions, the remand be limited to issues of liability. The defendants, on the other hand, contend that they are entitled to a new trial on all issues, including damages.

"An appellate court has broad discretion to remand for a new trial on all, or only some, of the issues in the case." *Dopp v. HTP Corp.*, 947 F.2d 506, 518 (1st Cir. 1991); *see also* Fed.R.Civ.P. 59(a). Normally, an order remanding a case for a new trial should encompass all of the issues in the case, "unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 499–500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). The decision to remand a case for a new trial on fewer than all of the issues thus depends not only upon a finding that the issues are logically distinct, but also upon considerations of equity and practicality.

The question whether a plaintiff has suffered certain damages does not generally depend, as a matter of law, on whether that plaintiff is legally entitled to compensation for those damages. In this case, for example, the amount of future income that Wilson may have lost as a result of his injuries is independent of his legal claim to receive full, partial, or no compensation for such damages. In this regard, "comparative negligence is regarded as a liability concept." *La Plante v. American Honda Motor Co.*, 27 F.3d 731, 738 (1st Cir.1994). We have held that the issues of liability, including issues of comparative negligence, were in certain cases "so distinct and separable from the damages issue[s] that a partial trial of the former [could] be had without injustice." *Id.; see also Winn v. Lafayette Town House*, 839 F.2d 835, 836–37 (1st Cir.1988); *Calaf v. Fernandez*, 239 F. 795, 799 (1st Cir.1917). In *La Plante*, for example, we found particularly compelling the fact that "the trial judge submitted detailed interrogatories to the jury, [so that] we [knew] the jury's total damage award to the plaintiff, as well as the amount discounted due to comparative negligence." 27 F.3d at 738. Thus, on remand, "if the comparative negligence figures [were] changed as a result of the new trial, the total damage award [could] be adjusted accordingly." *Id.*

In theory, the amount awarded by a jury in the form of compensatory damages should not be influenced by the jury's findings as to liability. Sometimes, however, the possibility may arise that the jury's special verdicts on damages might have encompassed some undisclosed compromise. For example, a jury could raise the amount of damages awarded if the jurors perceive the plaintiff to be particularly deserving of their solicitude, or the defendant particularly deserving of their opprobrium. The likelihood of this possibility occurring may increase when, as here, the jury is given no instruction at all on comparative negligence. In such cases, it might happen that a jury could understand the judge's decision not to instruct on comparative negligence as an implicit indication that there was not enough evidence of the plaintiff's contributory negligence to even submit the question to them. It is not unimaginable for a jury to infer from the fact that there was no instruction on comparative negligence that the award of damages should be increased as an additional sanction.

In the end, our decision as to the scope of our remand order is a matter of judgment.

In this particular case, because of the possibility that the jury might have been led by the lack of an instruction on comparative negligence to increase the total award of damages, and out of an abundance of caution, we order a retrial of all issues in this case, including damages.

### IV. *Conclusion*

Because we find that the district court's failure to instruct the jury on comparative negligence and the primary duty rule was both erroneous and prejudicial to the defendants' substantial rights, we strike the verdict, **vacate** the judgment, and **remand** this case for a new trial on all issues, including damages. The request for a remittitur is therefore moot. No costs.