Pino v. F.W. Webb Co.                    CV-97-261-SD   02/08/99

UNITED STATES DISTRICT COURT FOR THE

                    DISTRICT OF NEW HAMPSHIRE


Delores F. Pino


        v.                            Civil No. 97-261-SD


F.W. Webb Company


                        O R D E R

     In the instant civil action, plaintiff Delores Pino alleges
that her former employer, F.W. Webb Company, terminated her
employment based on age and disability in violation of the Age
Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 623(a), and
the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a).
The complaint also contains state-law claims based on New
Hampshire Revised Statutes Annotated (RSA) 354-A and wrongful
discharge.  Currently before the court is defendant's motion for
summary judgment, to which plaintiff objects.


                        Background

     Delores Pino worked for F.W. Webb from 1969 until 1996, when
her employment in the accounts payable department of F.W. Webb's
Merrimack, New Hampshire, distribution center was terminated.
Plaintiff's position required her to process accounts payable

paperwork and act as the receptionist and switchboard operator. The accounts payable work involved matching invoices against packing slips and reconciling discrepancies between the documents. It is advantageous to process the invoices as quickly as possible because most of F.W. Webb's suppliers provided a discount on all invoices processed within a specified time period. Due to the large volume of invoices that needed to be processed, plaintiff regularly worked overtime and took invoices home to process. During busy times of the year, one employee could not handle all the accounts payable work, and Charles Slattery, the vice president for purchasing, encouraged the distribution center to assign other employees to help process invoices.

On March 12, 1996, Pino slipped on ice in F.W. Webb's parking lot, injuring her neck and back. Plaintiff returned to work full time on March 19, 1996. Her doctors, however, subsequently advised her to limit her work to four hours per day. She continued to work four hours per day until she was terminated on August 5. During this period she requested to continue taking invoices home, but this request was denied. Other employees with prior accounts payable experience were called upon to assist with the work during this period. Sheryl Marsnick, who was hired during that summer to be a "floater," also assisted with the accounts payable work.

F.W. Webb's workers' compensation insurance carrier requested a workplace analysis. The study, conducted by J & J Strategic Management Resources, concluded that Pino could increase her work hours to six hours per day if she were allowed to work two three-hour blocks of time with a break for physical therapy in between. F.W. Webb, however, took no steps toward implementing this plan.

During this time period, Pino's direct supervisor, Robert Wallace, informed Slattery that several employees had complained about having to help with the accounts payable work. Pino, however, disputes that the employees complained. Wallace also expressed his opinion that the company needed a full-time accounts payable person. Wallace subsequently received a phone call from Slattery telling him to terminate Pino. Gerald Fortier, the general manager of the distribution center, also participated in the termination decision. F.W. Webb did not notify Pino before her termination that she would be replaced if she did not return to work full time.

Pino was replaced by Jennifer Rhines, who was approximately nineteen years old and had no experience in accounts payable. Wallace explained his decision to hire a young, inexperienced worker by stating, "I thought if we got a young person, we could break them [sic] in and do the work the way we wanted it done and give them a chance." Wallace Deposition at 96. Other employees

3

continued to assist with the accounts payable work after Pino's replacement began work. Rhines resigned after approximately six to eight months. Currently, the accounts payable work is performed by two employees, Bernice Coburn and Rose Marie Spare. Both employees split their time between accounts payable and other functions. Fortier testified that he made the decision to have two employees perform the accounts payable work because "the job got too big for one person." Fortier Deposition at 10-11.

At the time of her discharge, Pino, who was fifty-five, was the oldest office employee at the distribution center. Several other employees, however, were over forty, including Fortier, who was fifty, Wallace, who was fifty-one, and Claudette Adams and Jeffrey Goddard, who were forty-one and forty-three respectively. Pino has testified that Wallace referred to her as "the old bat, the old bag, the oldest one in the office, the antique." Pino Deposition at 156.

## Discussion

### 1. Standard of Review

The entry of summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

4

Fed. R. Civ. P. 56(c). Because the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Stone & Michaud Ins., Inc. v. Bank Five for Sav., 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Although "motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal," Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994), the court must scrutinize the entire record in the light most favorable to the nonmovant, with all reasonable inferences resolved in that party's favor. Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994), cert. denied, 514 U.S. 1108 (1995); see also Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994).

"In general, . . . a party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." National Amusements, Inc. v. Town of Dedham, 43 F. 3d 731, 735 (1st Cir.) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)), cert. denied, 515 U.S. 1103 (1995).

When a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial," there can no longer be a genuine issue of material fact. Celotex Corp., supra, 477 U.S. at 322-23. The failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law. See id.

## 2. The ADA Claim

To prevail on her ADA claim, plaintiff must show "that: (1) she was 'disabled' within the meaning of the ADA; (2) she was a 'qualified individual,' i.e., that either with or without reasonable accommodation she was able to perform the 'essential functions' of her former position; and (3) her discharge was due, in whole or in part, to her disability." Laurin v. Providence Hosp., 150 F.3d 52, 56 (1st Cir. 1998). F.W. Webb argues it is entitled to summary judgment in this case because Pino is not a qualified individual with a disability since she cannot work full time. Plaintiff, on the other hand, contends that a part-time schedule is a reasonable accommodation.

Thus the determination of whether Pino is a "qualified individual" depends upon whether working full time is an "essential function" or a "reasonable accommodation." "The ADA

6

does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." <u>Feliciano v. State of Rhode Island</u>, 160 F.3d 780, 785 (1st Cir. 1998). Accordingly, if working full time is an "essential function," then plaintiff's proposed accommodation is per se unreasonable.

Equal Employment Opportunity Commission interpretive regulations provide guidance in determining the "essential functions" of a position.

> (1) *In general.* The term *essential function* means the fundamental job duties of the employment position the individual with a disability holds . . . . The term "essential functions" does not include the marginal functions of the position.
> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
> (i) The function may be essential because the reason the position exists is to perform that function;
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.
> (3) Evidence of whether a particular function is essential includes, but is not limited to:
> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions . . . . ;
> (iii) The amount of time spent on the job performing the function;

> (iv) The consequences of not requiring the
> incumbent to perform the function;
>
> . . .
> (vi) The work experience of past incumbents
> in the job; and/or
> (vii) The current work experience of
> incumbents in similar jobs.

29 C.F.R. § 1630.2(n).

The question of whether a particular function is essential is fact specific, "such that it is relatively rare that a trial court may enter summary judgment." Laurin, supra, 150 F.3d at 52 (stating that since plaintiff bore the burden on essential function, summary judgment may nevertheless be appropriate). According to the ADA, "The term 'reasonable accommodation' may include . . . job restructuring [and] part-time or modified work schedules . . . ." 42 U.S.C. § 12111(9)(b). Thus the statutory language presumes that working full time will not generally be an "essential function." Although "essential function" could be narrowly defined to include only the capability to perform particular tasks, the First Circuit has "held that the phrase 'essential function' is to be defined broadly, and that it may be more encompassing than such core job requirements as an employee's technical skills and experience, even including such individual or idiosyncratic characteristics as scheduling flexibility." Laurin, supra, 150 F.3d at 59 n.6 (internal citations omitted). But see 9 Lex K. Larson, Employment Discrimination § 153.05[2] at 153-46 (2d ed. 1998) ("'[A]ttendance' does not

seem to be a 'function' at all; it goes more to whether the plaintiff can 'perform' the job. This matter should be thoughtfully considered, since flexibility in work scheduling . . . is a contemplated and oft-used accommodation . . . . To take this device outside the realm of possible accommodations . . . could be a significant impediment to achieving the Act's goals."). In Laurin, the First Circuit held that a maternity nurse, who was unable to work night shifts, could not perform an essential function of the position. See Laurin, supra, 150 F.3d at 61. The court noted that "a 24-hour hospital unit imposes exceptional nurse-scheduling demands upon the hospital-employer." Id. at 59. Accordingly, it felt the suggestion that the ability to work evening shifts was not an essential function "would be tantamount to maintaining that night work is not an 'essential function' of a night watchman's job, even though that is the only time the premises are not otherwise occupied." Id.

In this case, F.W. Webb supports its contention that a full-time work schedule is an "essential function" of the accounts payable position by citing its policy requiring all distribution center office staff to work full time, the fact that Pino formerly worked full time, and its statement that it is its business judgment that the position requires a single full-time employee. Defendant emphasizes the importance of processing the invoices quickly and states that hiring another employee to help

was not feasible because the position required a great deal of training. Plaintiff, however, contends that the invoicing was never solely her responsibility--other employees had always helped with some of the work. See Wallace Deposition at 33. Pino also points to the fact that the accounts payable work is currently performed by two employees. See Fortier Deposition at 10. This evidence supports Pino's contention that the accounts payable work could be shared by two part-time employees.

Pino further argues that F.W. Webb refused to implement other reasonable accommodations. Specifically, she contends the company could have allowed her to continue bringing invoices home to process and that it should have offered her the "floater position" that was created in the summer of 1996.

> Section 12111(9)(B) of the ADA states that 'reasonable accommodation' may include 'reassignment to a vacant position.' 42 U.S.C. § 12111(9)(B). The plaintiff, as the party who must prove that he or she can perform the essential functions of the position with or without reasonable accommodation, bears the burden of showing the existence of a reasonable accommodation.

Feliciano, supra, 160 F.3d at 786. In this case, plaintiff has shown there was an empty position, for which she was qualified, that F.W. Webb filled shortly before firing her.

Given the conflicting evidence in this case, the court concludes that there is a triable issue of fact regarding whether

10

plaintiff could perform the essential functions of her position with or without a reasonable accommodation.

F.W. Webb next argues that Pino's proposed accommodations would impose an undue hardship upon it. The ADA does not require employers to provide an accommodation if the employer can show that doing so would cause it an undue hardship. The ADA defines undue hardship as follows.

> The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).
> (B) Factors to be considered
> . . . .
>   (i) the nature and cost of the accommodation
> . . . .
>   (ii) the overall financial resources of the facility . . . .
>   (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities . . . .

42 U.S.C. § 12111(10).

F.W. Webb argues that hiring and training a second worker to assist with the accounts payable work would have been impossible because the position required extensive training. Yet the company did hire and train a new worker with little experience just as it was entering its busiest season. It would seem reasonable to conclude that hiring a part-time employee to work with Pino would have entailed no additional expense or loss of efficiency. Defendant further contends that the alternative--

11

having other employees continue helping with accounts payable--
was unreasonably disruptive to its operations.  Yet Pino's
evidence indicates that other employees were called upon to
continue helping with accounts payable after her termination.
Accordingly, the court concludes defendant is not entitled to
summary judgment on this ground.

### 3. The ADEA Claim

In an age discrimination case, "the plaintiff bears the
ultimate '"burden of proving that [her] years were the
determinative factor in [her] discharge, that is, that [she]
would not have been fired but for [her] age."'"  Hildago v.
Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 332 (quoting
Mesnick v. General Elec. Co., 950 F.2d 816, 823 (1st Cir.1991)
(quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1335 (1st
Cir. 1988))).  Plaintiff may prove that her termination was based
on age in one of two ways.  Naturally, a plaintiff can show
discrimination via direct evidence.  "Where . . . there is no
direct evidence of the defendant's [discriminatory] animus, the
McDonnell Douglas burden-shifting framework is used to allocate
and order the burdens of producing evidence."  Fennell v. First
Step Designs, Ltd., 83 F. 3d 526, 535 (1st Cir. 1996).

Pino contends that this case involves direct evidence of
discriminatory animus.  Specifically, she points to the

derogatory age-related terms Wallace used to describe her and Wallace's statement that he hired an inexperienced replacement because he thought "if we got a young person, we could break them [sic] in to do the work the way we wanted it done . . . ." Wallace Deposition at 96. Defendant, however, states that this is not a case of direct evidence. The court agrees. In a recent case, the First Circuit explained that the use of racially charged terms was not direct evidence of discriminatory termination when the terms were not made in connection with the decisional process. See Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 97 (1st Cir. 1996). Similarly, although Wallace's statements regarding why he hired a young, inexperienced replacement are probative, they are not direct evidence of the animus behind Pino's termination. Thus this case must be analyzed by way of the McDonnell-Douglas burden-shifting framework. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).

"The burden-shifting framework announced in McDonnell Douglas Corp. v. Green, and imported for use in ADEA cases, allocates burdens of production and orders the presentation of evidence so as 'progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.'" Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995) (internal citations omitted) (quoting Texas Dept. of Community

13

<u>Affairs v. Burdine</u>, 450 U.S. 248, 255 n.8 (1981)).  At the first step of the burden-shifting process the plaintiff is required to make a prima facie showing that "(1) [she] was at least forty years of age, (2) [she] met the employer's legitimate job performance expectations, (3) [she] experienced adverse employment action, and (4) [she] was replaced by a person with roughly equivalent job qualifications."  <u>Goldman v. First Nat'l Bank of Boston</u>, 985 F.2d 1113, 1117 (1st Cir. 1993).

Once the plaintiff has met her burden at step one, the employer must produce evidence that, taken as true, would "permit a rational factfinder to conclude that there was a 'nondiscriminatory reason' for the challenged employment action, thereby displacing the legal presumption of intentional discrimination  . . . ."  <u>Woodman</u>, <u>supra</u>, 51 F.3d at 1091 (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507 (1993)).

Once the employer has provided evidence of a legitimate nondiscriminatory reason for the termination, the burden of production shifts back to the plaintiff, who must adduce evidence that the employer's proffered reason was really a pretext for illegal discrimination.  Although the plaintiff bears the burden of proving discriminatory animus, he or she "may rely upon the same evidence to establish both pretext and discrimination, provided it is adequate to enable a rational factfinder

14

reasonably to infer that intentional age-based discrimination was a determinative factor in the adverse employment action." Woodman, supra, 51 F.3d at 1092. "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." Hicks, supra, 509 U.S. at 511.

In this case, F.W. Webb argues that Pino has not satisfied her prima facie burden because she was not fulfilling F.W. Webb's legitimate job performance expectations. "The plaintiff's prima facie burden . . ., however, is 'not onerous.'" Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 n.4 (1st Cir. 1994) (quoting Mesnick, supra, 950 F.2d at 823). The plaintiff need only put forward sufficient evidence to create a plausible inference that she was meeting the employer's needs. Pino's testimony that her employer never told her she would be terminated if she did not return to work full time supports this inference. Furthermore, Pino's evidence that the accounts payable work was always performed by multiple employees, and continued to be so after her termination, undermines F.W. Webb's insistence that it needed a single, full-time employee to perform the accounts payable function. Accordingly, the court feels the question of whether Pino was meeting her employer's legitimate expectations is more

properly analyzed at the latter steps of the burden-shifting framework.

As an employer "need only produce enough competent evidence, taken as true, to enable a rational factfinder to conclude that there existed a nondiscriminatory reason for the challenged employment action," it is clear that F.W. Webb has met its burden. Ruiz v. Posadas de San Juan Assoc., 124 F.3d 243, 248 (1st Cir. 1997). Thus the presumption of discrimination is eliminated, and Pino bears the burden of adducing evidence that F.W. Webb's proffered reason for her termination was false and that age was the real motivating factor.

The court is convinced that Pino's evidence creates a material issue of fact on the question of pretext. First, F.W. Webb disregarded the evaluation suggesting that with a modified schedule, Pino could have been working six hours a day in August of 1996 and could have gradually increased her hours to full time. Second, as Pino argues, if the company believed she could and should work full time, it would have made sense for it to warn her that she would be terminated unless she resumed working full time. Third, Pino's testimony that she was denied permission to continue taking work home undermines F.W. Webb's contention that it was solely concerned with increasing the rate at which invoices were processed. Similarly, F.W. Webb's assertion that the approach of its busy season motivated it to

terminate Pino could be seen as inconsistent with its decision to fill the position with an inexperienced replacement, who it appears caused the company to fall further behind.

Pino's evidence that her termination was tainted by age discrimination is likewise sufficient to preclude summary judgment. F.W. Webb argues that Wallace's derogatory age-related remarks are irrelevant because he was not involved in the termination decision. Although Slattery claims to have been the decision maker in this case, as Pino points out, he did not work in the Merrimack office and relied upon information from Wallace and Fortier in making his decision. Accordingly, Wallace's reports to Slattery that other employees were complaining about helping with the accounts payable work and that they needed a full-time worker to perform the position could be construed as part of the decision-making process. Similarly the company's decision to hire a nineteen-year-old replacement and Wallace's statement that he wanted a young person because he felt she would "do the work the way we wanted it done," is circumstantial evidence of age discrimination. Accordingly plaintiff's age discrimination claim cannot be decided on summary judgment.

4. The State-Law Claims

Plaintiff concedes that RSA 354-A does not create a private right of action for individuals aggrieved by unlawful

17

discrimination. Accordingly the court need only address her wrongful discharge claim. Defendant requests summary judgment on this count based on the First Circuit's holding in Smith v. F.W. Morse & Co., that "the existence of [a statutory] remedy precludes [a plaintiff] . . . from asserting a common law claim for wrongful discharge." 76 F.3d 413, 429 (1st Cir. 1996). As federal statutes provide remedies for age and disability discrimination, defendant argues that Pino's wrongful discharge claim is precluded. Pino, however, argues that a recent New Hampshire Supreme Court case indicates that the First Circuit's holding in Smith was an incorrect interpretation of New Hampshire law. See Dow v. Sears, Roebuck & Co., 720 A.2d 598 (N.H. 1998). The court, however, disagrees. Dow merely holds that a finding of no probable cause under RSA 354-A by the New Hampshire Commission for Human Rights does not preclude a plaintiff from pursuing common-law remedies. See id. at 599. The case in question did not deal with the elements of a wrongful discharge claim.

Furthermore, even assuming arguendo that the availability of a remedy under the ADA and ADEA did not preclude a wrongful discharge claim based on age and disability discrimination, these claims would still fail under New Hampshire law. See Howard v. Dorr Woolen Co., 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980).

18

To make out a wrongful discharge claim, the plaintiff must prove that she performed an act that public policy would encourage or refused to perform an act that violated public policy. See id. Accordingly, the New Hampshire Supreme Court has held that

> reliance upon Monge v. Beebe Rubber Co., supra [announcing wrongful discharge exception to doctrine of employment at will], for the proposition that a discharge due to age or sickness warrants recovery is misplaced. We construe Monge to apply only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn. A discharge due to sickness does not fall within this category . . . ."

Id. (internal citations omitted).

Plaintiff's complaint, however, states a third basis for her wrongful discrimination claim--an allegation that her termination was in retaliation for having filed a workers' compensation claim. See Complaint ¶ 32. F.W. Webb has not presented any argument for summary judgment on this claim. Most states have recognized the tort of retaliatory discharge for filing a workers' compensation claim either by statute or by judicial decision. See 6 ARTHUR LARSON & LEX LARSON, LARSON'S WORKERS' COMPENSATION LAW § 68.36(a) (1998). The New Hampshire's workers' compensation statute does not provide a cause of action for retaliatory discharge. The common law of wrongful discharge, however, provides a remedy for a discharge that was motivated by retaliation when the employee has acted in accordance with public

19

policy. A jury could certainly find that public policy would favor employees asserting their rights under the workers' compensation system. As one commentator has noted, "if a jurisdiction is prepared to recognize any exception at all to employment at will, the compensation claim cases would be the clearest possible application . . . ." <u>Id.</u> Accordingly, Pino's wrongful discharge claim based on the allegation that she was fired in retaliation for filing a workers' compensation claim may proceed.

<div align="center"><u>Conclusion</u></div>

For the abovementioned reasons, defendant's motion for summary judgment (document no. 23) is denied in part and granted in part.

SO ORDERED.

<div style="margin-left: 50%;">
_____<br>
Shane Devine, Senior Judge<br>
United States District Court
</div>

February 8, 1999

cc:  H. Jonathan Meyer, Esq.
     Dennis T. Ducharme, Esq.
     Judith Ashton, Esq.